HANSON BRIDGETT LLP
Robert A. McFarlane, SBN 172650
rmcfarlane@hansonbridgett.com
Christopher S. Walters SBN 267262
cwalters@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

REGARD IP LAW
Michael N. Berg, SBN 159771
mberg@regardip.com
425 California Street, Suite 1700
San Francisco, CA 94104
Telephone:     (415) 398-9600
Facsimile:     (415) 236-6100

MICHAEL J. BROWN LAW OFFICE LLC
Michael J. Brown (*pro hac vice*)
michael@mjbrownlaw.com
570 W. Mt. Pleasant Avenue, Suite 101
Livingston, NJ 07039
Telephone:     (973) 577-6300
Facsimile:     (973) 577-6301

Attorneys for Plaintiff / Counterdefendant
VISTAN CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| VISTAN CORPORATION,<br><br>Plaintiff,<br>v.<br>FADEI USA, INC., PAN AMERICAN ENGINEERING and EQUIPMENT CO., INC., MANUEL SILVA, and MARIANI PACKING CO., INC.,<br>Defendants. | CIVIL ACTION<br>NO. 10-4862 JCS<br><br>**VISTAN CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Hon. Joseph C. Spero<br>Crtrm.:   G<br><br>Claim Construction Hearing:<br>Jan. 12, 2012, 9:30 am<br><br>Trial Date:<br>TBD |
| FADEI USA, INC., PAN AMERICAN ENGINEERING and EQUIPMENT CO., INC., MANUEL SILVA, and MARIANI PACKING CO., INC.,<br>Counterclaimants,<br>v.<br>VISTAN CORPORATION,<br><br>Counterdefendant. | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................... 1

       A.     Background of the Invention .............................................................. 1

       B.     The '949 Patent Embodiments ........................................................... 3

II.    THE PRINCIPLES OF CLAIM CONSTRUCTION .................................... 4

       A.     Claims Must Be Construed in Light of the Specification. ................. 5

       B.     Limitations Should Not Be Imported From The Specification To The
              Claims ................................................................................................. 6

       C.     Extrinsic Evidence Such As Expert Testimony May Not Be Used to
              Contradict the Unambiguous Intrinsic Record. ................................. 7

III.   CONSTRUCTION OF THE CLAIM TERMS AT ISSUE .............................. 8

       A.     Fruit .................................................................................................... 8

       B.     Pitting ................................................................................................. 9

       C.     Pitting Operation ............................................................................. 10

       D.     Active Assembly .............................................................................. 13

              1.     Active Assembly Should be Given its Ordinary Meaning ....... 13

              2.     Active Assembly Is Not Indefinite .......................................... 15

       E.     Holders ............................................................................................ 17

       F.     Pockets ............................................................................................. 18

       G.     Open Configuration ......................................................................... 19

       H.     Vary the Gripping Force .................................................................. 20

       I.     During the Pitting Operation and After the Pitting Operation ......... 22

IV.    CONCLUSION ................................................................................................ 24

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*ACTV, Inc. v. Walt Disney Co.*
  346 F.3d 1082 (Fed. Cir. 2003) ......................................................................... 5

*Agilent Techs., Inc. v. Affymetrix, Inc.*
  567 F.3d 1366 (Fed. Cir. 2009) ........................................................... 15, 18, 22

*Catalyst & Chemical Services, Inc. v. Global Ground Support*
  350 F.Supp.2d 1 (D. D.C. 2004) ....................................................................... 10

*Datamize, LLC v. Plumtree Software, Inc.*
  417 F.3d 1342 (Fed. Cir. 2005) ........................................................... 15, 16, 23

*DSW, Inc. v. Shoe Pavilion, Inc.*
  537 F.3d 1342 (Fed. Cir. 2008) ......................................................................... 6

*Energizer Holdings, Inc. v. Int'l. Trade Comm'n.*
  435 F.3d 1366 (Fed. Cir. 2006) ....................................................................... 16

*Exxon Research & Eng'g Co. v. United States*
  265 F.3d 1371 (Fed. Cir. 2001) ....................................................................... 16

*Georgia-Pacific Corp. v. United States Gypsum Co.*
  195 F.3d 1322 (Fed. Cir. 1999), *cert. denied* 531 U.S. 816 (2000) ................... 15

*Haemonetics Corp. v. Baxter Health Care Corp.*
  607 F.3d 776 (Fed. Cir. 2010) ......................................................................... 16

*Honeywell Int'l., Inc. v. ITT Indus., Inc.*
  452 F.3d 1312 (Fed. Cir. 2006) ......................................................................... 8

*Intervet Inc. v. Merial Ltd.*
  617 F.3d 1282 (Fed. Cir. 2010) ........................................................... 6, 12, 15, 19

*Kara Technology Inc. v. Stamps.com, Inc.*
  582 F.3d 1341 (Fed. Cir. 2009) ........................................................... 6, 7, 8, 12

*Kathrein-Werke KG v. Radiacion y Microondas S.A.*
  No. 07 C 2921, 2010 WL 2011939, at *5 (N.D. Ill. May 17, 2010) ................... 17

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*
  324 F.3d 1308 (Fed. Cir. 2003) ......................................................................... 5

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577
  (1996) ................................................................................................................. 5

3864808.1

10-4862 JCS

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

*O2 Micro Int'l., Ltd. v. Beyond Innovation Tech. Co.*
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 23

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005) *cert. denied,* 546 U.S. 1170 (2006) .......... passim

*Relume Corp. v. Dialight Corp.*
    63 F.Supp.2d 788 (E.D.Mich. 1999) ......................................................... 10

*Renishaw PLC v. Marposs Societa' per Azioni*
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................... 5

*Silicon Graphics Inc. v. ATI Technologies, Inc.*
    607 F.3d 784 (Fed. Cir. 2010) ............................................................... 6, 12

*Techtronic Industries Co. Ltd. v. Chervon Holdings Ltd.*
    395 F.Supp.2d 720 (N.D. Ill. 2005) .......................................................... 10

*Terlep v. Brinkmann Corp.*
    418 F.3d 1379 (Fed. Cir. 2005) ................................................................. 22

*U.S. Surgical Corp. v. Ethicon, Inc.*
    103 F.3d 1554 (Fed. Cir. 1997) ............................................................ 22, 23

*Univ. of Pittsburgh v. Varian Medical Systems, Inc.*
    2011 U.S.Dist. LEXIS 52078, **42-43 (W.D.Pa. 2011), *modified on other grounds,*
    2011 U.S.Dist. LEXIS 52095 (W.D.Pa., May 16, 2011) ................................. 23


## STATUTES

35 U.S.C. § 112 ............................................................................................. 15

35 U.S.C. § 282 ............................................................................................. 16


## OTHER AUTHORITIES

*Manual of Patent Examining Procedure* (MPEP)
    Section 2173.05(e)(8th Ed., rev. 8, July 2010) ........................................... 17


## MISCELLANEOUS

*Encarta, World English Dictionary* (1999) ............................................... 8, 23

*Random House Webster's Unabridged Dictionary,* (2d ed. 1998) .......................... passim

# I.   INTRODUCTION

The parties to this action collectively ask the Court to construe a total of 10 claim terms, four of which were proposed by the Plaintiff Vistan Corporation ("Vistan").  Vistan proposes constructions that are supported by the language of the claims, the specification, and, where appropriate, extrinsic evidence in the form of dictionary definitions.  Defendants' constructions, on the other hand, repeatedly violate basic canons of claim construction because they import numerous limitations from the specification into the claims, render claim language superfluous through the proposal of lengthy and repetitive constructions, and, in one case, would needlessly create different constructions of a claim term for its use in different claims.  Vistan requests that the Court adopt each of its proposed constructions and reject those proposed by Defendants.

## A.   BACKGROUND OF THE INVENTION

Vistan asserts that Defendants infringe claims 5 and 12 of U.S. Patent No. 5,870,949 (the "'949 Patent").[1]  The '949 Patent discloses an improved fruit pitting machine that removes pits from prunes and other soft fruits using straight pitting knives that plunge through the fruit to eject the pit.  Because the apparatus described in the '949 Patent includes prior art technology for some of its operations, the specification sets forth a detailed description of certain prior art features before describing details of the improvements that comprise the claimed invention.

The '949 Patent generally describes the layout of a conventional automated fruit pitting apparatus in which fruit such as prunes are conveyed by a series of fruit "holders" to a set of pitting knives that force the pits out of the fruit.  *See* Cols. 1:20-24; 1:53-57; 2:50-54; 3:17-26; 3:55-60.  The holders contain a series of adjustable "pockets," to hold individual pieces of fruit.  Col. 1:53-63.  The location of these basic features in the machine are shown in Figure 1 of the '949

---

[1] All column and line references are to the '949 Patent unless otherwise noted.  For the Court's convenience a copy of the '949 Patent is provided herewith as Exhibit A to the Declaration of Michael J. Brown in Support of Vistan Corporation's Opening Claim Construction Brief ("Brown Decl.").

Patent. As shown, the holders convey the fruit in a loop through the machine and take them from the "hopper" 14 to the location of the pitting knives in the enclosure 22.



FIG. 1
(PRIOR ART)

A top view of the exemplary "holders" with their "pockets" is shown in Figure 2A, and the details of the pockets are shown in cross-section in Figure 3.



FIG. 2A

FIG. 3
(PRIOR ART)

As shown in Figure 3, the exemplary holders include a lower plate and two variable length rods. Cols. 1:63-2:1; 3:4-16. A pitting cup (sometimes referred to as a "pitting rubber" because they are typically made of hard rubber) is mounted on the lower plate at the location of each pocket, and the pitting rubbers have an opening through which the pit is ejected after being removed from the fruit by the pitting knife. Col. 3:4-8. Each holder has a series of panels or pocket members, and the rods and pocket members are lined up so that the sides of the pocket members define the adjustable pockets. Col. 1:59-63; Col. 12:38-46. The rods are biased with

1  springs, keeping each pair of pocket members at a set distance away from each other.  Col. 1:63-

2  Col. 2:1; Col. 12:49-57. The spring bias puts the pocket into what is described in the '949 Patent as

3  the open configuration.  Col. 1:64-Col. 2:1; Col. 12:49-55.

4  A roller carrier is attached at the end of each rod. Col. 1:55-57.  When pressure is applied

5  to the rollers, and thereby against the spring bias, it moves the opposing pocket members closer to

6  each other. Col. 2:1-5.  When the opposing pocket members are close to each other, the pocket is

7  in the closed configuration.  Col. 12:58-65.  Prior to fruit holders reaching the pitting location,

8  cam tracks apply pressure to the rods of the fruit holder, forcing the curved panels toward each

9  other, which in turn press against the prune in the pocket.  Col. 12:58-65.

10  During operation, the fruit holders travel to the "pitting head housing," where there are a

11  series of pitting knives poised to enter the pieces of fruit in the fruit holders. Cols. 3:54-60; 4:32-

12  34; 12:64-65; 19:49-51.  The pitting knives are illustrated in the bottom portion of Figure 7:

13

14

15

16  

17

18  FIG. 7
(PRIOR ART)

19  At the pitting location, the pitting knives enter the fruit at the top, push the pit down and

20  out of the fruit, and then push the pit further down and out of the fruit holder through the pitting

21  rubber at the bottom of the pocket.  Cols. 3:9-10; 4:18-36; 5:48:57; 12:64-65; 18:28-39; 19:49-51.

22  The pitting knives then retract up and out of the fruit, and the fruit holders move away from the

23  pitting location.  Col. 13:27-34.  The pockets of the fruit holders are back in the open

24  configuration after leaving the pitting location, and the fruit falls out of the fruit holders, which

25  return to the hopper for loading with another cycle of fruit.  Col. 13:34-40.

26  **B.   THE '949 PATENT EMBODIMENTS**

27  The '949 Patent claims two different embodiments of fruit pitting machines.  Claim 1 and

28  its dependent claims, which are <u>not</u> at issue in this action, relate to a fruit pitting machine that

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1    operates in a continuous manner, i.e., the fruit holders travel at a constant pace through the pitting

2    machine, even when pitting of the fruit is occurring.  Col. 12:63- 13:18.  Claims 5 and 12, along

3    with their dependent claims, are drawn to a fruit pitting machine which operates in an intermittent

4    manner, i.e., the fruit holders temporarily stop moving, thereby allowing pitting to occur in

5    stationary fruit holders.  Col. 18:40-49.

6         The continuous embodiment utilizes cam tracks[2] to control the configuration of the pockets

7    while the fruit holders are at the pitting location.  Col. 13:4-18.  The cam tracks have a leading

8    edge that press against the roller, which in turn urges the rods inward to close the pockets.  Col.

9    12:58-65.  The cam tracks have a pre-determined shape to control the opening and closing of the

10   pockets, by forcing the roller in varying distances relative to the holder, as the holder moves

11   through the pitting location.  Col. 12:38 – Col. 13:12.  The change in pressure applied by the cam

12   tracks varies the size of the pockets and the gripping force applied to the fruit in the pockets.

13        In the intermittent embodiment, the fruit holders are in a fixed position at the pitting

14   location.  Col. 18:43-49.  With the holders in a fixed position, the motion of the rollers against the

15   cam tracks is not used to open or close the pockets while at the pitting location.  Instead, an active

16   mechanism, i.e., the active assembly, is used to urge the pockets into the closed configuration

17   when the fruit holders are at the pitting location.  Col. 18:50- Col. 19:17.  The active assembly

18   applies pressure on the roller and roller carrier to urge the rods inward to put the pockets into the

19   closed configuration.  Col. 19:10-17; Col. 19:43-51.  The active assembly allows the pockets to

20   return to the open configuration by relieving pressure on the springs.  Col. 19:33-42; Col. 19:52-

21   57.  The change in pressure applied by the active assembly varies the size of the pockets and the

22   gripping force applied to the fruit in the pockets.  Col. 18:50-58.

23   **II.      THE PRINCIPLES OF CLAIM CONSTRUCTION**

24        Patent infringement analysis is a two-step process.  The first step consists of "claim

25   construction," the process through which the court determines the meaning and scope of the patent

26   _____

27   [2] An example of cam tracks are shown the reproduction of Figure 2A, above.

28

1   claims at issue.  *See Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1247-48 (Fed.

2   Cir. 1998); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517

3   U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).  Claim construction is a matter of law

4   exclusively for the court to decide.  *Markman,* 52 F.3d at 970-71.  After the claims are construed,

5   the trier of fact then determines whether there is infringement.  *See, e.g., Lockheed Martin Corp. v.*

6   *Space Systems/Loral, Inc.,* 324 F.3d 1308, 1318 (Fed. Cir. 2003).  The Federal Circuit's *en banc*

7   decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) *cert. denied,* 546 U.S. 1170

8   (2006), describes the methodology to be used in claim construction.  *Phillips* emphasizes the

9   primacy of the intrinsic record, including the claims, specification, and prosecution history.

10  Extrinsic evidence, such as dictionary definitions and expert testimony, is relegated to secondary

11  status.  *Id.*

12        "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to

13  which the patentee is entitled the right to exclude," and the claim language itself is of primary

14  importance in claim construction.  *Phillips*, 415 F.3d at 1312, 1314 (citations omitted) ("The

15  claims themselves provide substantial guidance as to the meaning of particular claim terms.").

16  Thus, Courts should look at the context in which a claim term is used in the claim to determine its

17  proper meaning.  *Id.*; *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir.

18  2003) ("the context of the surrounding words of the claim also must be considered in determining

19  the ordinary and customary meaning of those terms"). Other claims of the patent, both asserted

20  and unasserted, may also help determine the meaning of disputed claim terms.  *Phillips*, 415 F.3d

21  at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a

22  term in one claim can often illuminate the meaning of the same term in other claims.").

23        A.    CLAIMS MUST BE CONSTRUED IN LIGHT OF THE SPECIFICATION.

24        In addition to the claims, the specification is of paramount importance in claim

25  construction.  For purposes of claim construction, the claims "do not stand alone," but rather are

26  part of "'a fully integrated written instrument.'"  *Phillips*, 415 F.3d at 1315, *quoting Markman*, 52

27  F.3d at 978-79.  The claims "must be read in view of the specification, of which they are a part,"

28  and the specification "is always highly relevant to the claim construction analysis.  Usually, it is

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1   dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at

2   1315 (citation omitted).  A patentee's lexicography, either explicit or implicit, controls the

3   meaning of the claim term.  *Phillips,* 415 F.3d at 1316 ("The specification may reveal a special

4   definition given to a claim term by the patentee that differs from the meaning it would otherwise

5   possess.  In such cases, the inventor's lexicography governs.").[3]

6       B.   LIMITATIONS SHOULD NOT BE IMPORTED FROM THE SPECIFICATION TO THE
             CLAIMS.

7       "Construing the claims in light of the specification does not . . . imply that limitations

8   discussed in the specification may be read into the claims," and it is "important not to confuse

9   exemplars or preferred embodiments in the specification that serve to teach and enable the

10  invention with limitations that define the outer boundaries of claim scope." *Intervet Inc. v. Merial*

11  *Ltd.,* 617 F.3d 1282, 1287 (Fed. Cir. 2010).  Courts are specifically admonished that their reliance

12  on "the specification must not go so far as to import limitations into claims from examples or

13  embodiments appearing only in a patent's written description, unless the specification clearly

14  establishes that the patentee intended the claims and the embodiments in the specification to be

15  strictly co-extensive." *Silicon Graphics Inc. v. ATI Technologies, Inc.,* 607 F.3d 784, 792 (Fed.

16  Cir. 2010)*; see also DSW, Inc. v. Shoe Pavilion, Inc.,* 537 F.3d 1342, 1347 (Fed. Cir. 2008)

17  (holding that it was error for the district court to import a "track and roller limitation" stated in

18  certain of the claims that included the more generally phrased language "vertically disposed,

19  horizontally moveably positionable stack divider").

20      The rule against importing limitations from the specification is well illustrated by the

21  Federal Circuit's recent decision in *Kara Technology Inc. v. Stamps.com, Inc.* 582 F.3d 1341,

22  1347-48 (Fed. Cir. 2009).  The claims at issue in *Kara Technology* were directed to a software

23  system that permitted customers to print secured documents, e.g., stamps or airline tickets, from

24

25  _____

26  [3] The prosecution history may also inform claim construction.  *Phillips,* 415 F.3d at 1317.
    However, neither party asserts that the prosecution history provides guidance as to the claim terms
27  at issue here.

28

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

their home computers, where the system featured a method for verifying the authenticity of such documents to prevent the creation of unauthorized or counterfeit forms. *Id.* at 1344.   The specification repeatedly discussed a security "key" that was embedded in the pre-established data used in the system and the only detailed embodiment disclosed in the specification included such a security key in the pre-established data. *Id.* at 1347.

The claims at issue did not expressly recite the security key, and the claim construction dispute was whether claims were limited to require such a security "key".  The Federal Circuit held that the district court erred in construing the claims to require the security key, and left no ambiguity as to the impropriety of importing limitations from the specification into the claims. *Id.* at 1346.

> To be sure, the specification repeatedly discusses a key embedded in the pre-established data. . . . In the only detailed embodiments in the patent, the key is embedded in the pre-established data. [] This is not enough, however, to limit the patentee's clear, broader claims.  The claim language read in the context of the specification does not require that a key be contained in the pre-established data, the patentee did not act as his own lexicographer or disavow claim scope.  It is the claims that define the metes and bounds of the patentee's invention.  The claims, not specification embodiments, define the scope of patent protection.  The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.

*Id.* at 1347-48 (internal citations and quotations omitted).

C.   EXTRINSIC EVIDENCE SUCH AS EXPERT TESTIMONY MAY NOT BE USED TO CONTRADICT THE UNAMBIGUOUS INTRINSIC RECORD.

Although *Phillips* emphasizes the primacy of the intrinsic record, it also permits courts to rely on extrinsic evidence, i.e., all evidence "external to the patent and prosecution history," such as expert and inventor testimony, dictionaries, and learned treatises.  *Phillips, at 1317.*  However, even though extrinsic evidence "can shed useful light on the relevant art. . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Id.* (citations omitted).  Dictionaries and treatises can be particularly useful in claim construction to aid the Court in better understanding the technology at issue and the way in which one of ordinary skill in the art might use the claim terms.  *Id.* at 1318.  Thus, dictionaries and treatises "may be considered if the court deems it helpful in determining the true meaning of language used in the

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1  patent claims." *Id* (citation omitted).

2       Extrinsic evidence in the form of expert testimony may also be useful to a court during

3  claim construction, for such purposes as providing background on the invention, explaining how

4  an invention works, or establishing that a particular term of art in the patent has a particular

5  meaning in the pertinent field. *See id. at 1318.* However, "conclusory, unsupported assertions by

6  experts as to the definition of a claim term are not useful to a court." *Id.* Moreover, given the

7  secondary role of extrinsic evidence, and specifically expert testimony, it "cannot overcome more

8  persuasive intrinsic evidence," and courts "should discount any expert testimony that is clearly at

9  odds with the claim construction mandated by the claims themselves, the written description and

10  the prosecution history." *Id.; see also Kara Technology, Inc.*, 582 F.3d at 1348.

11  **III.   CONSTRUCTION OF THE CLAIM TERMS AT ISSUE**

12       A.   <u>FRUIT</u>

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Fruit (5, 12) | Drupe capable of having the pit removed without slicing or cutting the drupe open. | The term fruit is defined to mean one item or article of fruit. |

17       The specification unambiguously states that "[t]his invention is an apparatus for removing

18  pits from prunes or similar fruits such as dates," Col. 1: 6-7, and describes the invention as being

19  used with these fruits. *See, e.g.,* Col. 2:50-54 ("apparatus is positioned so that the prunes, dates, or

20  similar soft fruit to be pitted (e.g., prunes P shown in Figs. 1 and 2) drop into the holders"). This

21  language is indicative of the patentee's intention that the invention specifically relates to a certain

22  kind of fruit. *See, e.g., Honeywell Int'l., Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1318 (Fed. Cir.

23  2006) (finding that unambiguous language referring to a feature as being "this invention," when it

24  did not merely discuss a preferred embodiment, limited the scope of the claims). A "drupe" is the

25  term that describes the category of fruit contemplated by the '949 Patent, i.e., a fruit [having] a

26  thin outer skin, soft pulpy middle, and a hard stony central part that encloses a seed." *See* Brown

27  Decl., Exh. B (*Encarta, World English Dictionary* (1999), at p. 551). Thus, the term "fruit" is

28  appropriately construed to mean "drupe capable of having the pit removed without slicing or

cutting drupe open."

B. <u>PITTING</u>

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Pitting (5, 12) | The act of removing a pit from within a drupe, in the context of forcing the pit outside the skin of the drupe.  Pitting does not comprise slicing or otherwise opening the fruit to remove a pit. | Plaintiff requests a construction of the term "Pitting."  The term "Pitting" in either claim 5 and claim 12 is used only as an adjective that does not appear in the claims apart from a noun subject.  "Pitting" is not used as a verb or as a noun in the claims.  Accordingly, the term "pitting" in isolation has no independent construction apart from the noun subjects that it precedes.  Those subjects include "apparatus", "knife", "path" and "operation." <br><br> Nevertheless, to the extent the court construes the adjective "Pitting" apart from the noun terms it modifies in each of claims 5 and 12, the term is defined as removing pits from an article of fruit. |

The specification defines "[t]he invention" as "an apparatus for removing pits from prunes or similar fruits such as dates," Col. 1:6-7, and clearly explains that the claimed invention executes pitting by forcing the pit outside the skin of the drupe, as reflected in Vistan's proposed construction.  Col. 3:58-60 ("reciprocating pitting knife assembly in housing 22 engages the translating prunes (or other articles) to push out the pit from within each prune); Col. 12:64-65 ("the pitting knives engage the fruit gripped in the pockets to eject the pits from the fruit"); Col. 18:31-35 ("This knife path desirably results in cleaner pitting of prunes (by vertical ejection of their pits), with less horizontal motion (and indeed without significant horizontal motion) of the knife relative to each prune when the knife is engaged with the prune. . . .").  Thus, the specification clearly explains that the "pitting," as used in the claims of the '949 Patent is "the act of removing a pit from within a drupe," that it consists of "forcing the pit outside the skin of the drupe," and that it does not comprise "slicing or otherwise opening the fruit to remove a pit."

Vistan's proposed construction is also consistent with and supported by the ordinary meaning of "pitting."  Brown Decl., Exh. B, at p. 1374 ("to remove the kernel or stone from a fruit"); and Exh. C, *Random House Webster's Unabridged Dictionary*, at 1476 (2d ed. 1998) ("to

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1   remove the pit from a fruit or fruits").

2          Defendants at least partially agree with Vistan's construction that "pitting" means

3   "removing pits from an article of fruit," but contend that "pitting" does not need to be construed

4   because it used solely as an adjective.  There is no merit to Defendants' position.  First, the '949

5   Patent does not merely use the term "pitting" as an adjective, but, in fact, uses the term to refer to

6   the act of removing a pit from within a drupe.  *See* '949 Patent, Abstract ("A fruit pitting apparatus

7   . . . for driving pitting knives relative to holders containing fruit, an active separating assembly

8   which improves the efficiency of separation of the pitted fruit flesh from the holders *after pitting*,

9   and a wiping blade positioned to wipe pits from the holders *after pitting*. . . ." (emphasis added));

10  Col.8:60-66 ("In such variations, the fruit holders are translated into position for *pitting*, then

11  remain stationary during *pitting*, and are then translated away from the pitting position. However,

12  conventional pitting apparatus employing such an intermittent conveyor-drive have not efficiently

13  separated the pitted fruit flesh (and pits) from the holders after *pitting"* (emphasis added).  Second,

14  even if "pitting" were strictly an adjective, there is no established canon of claim construction that

15  adjectives are unworthy of construction.  Indeed, adjectives are often construed.  *See, e.g.,*

16  *Techtronic Industries Co. Ltd. v. Chervon Holdings Ltd.,* 395 F.Supp.2d 720, 726 (N.D. Ill. 2005)

17  (construing the adjective "uneven"); *Catalyst & Chemical Services, Inc. v. Global Ground*

18  *Support,* 350 F.Supp.2d 1, 15 (D. D.C. 2004) (construing the adjective "stationary"); *Relume*

19  *Corp. v. Dialight Corp.,* 63 F.Supp.2d 788, 807 (E.D.Mich. 1999) (construing the adjective

20  "adjustable").  Consequently, the Court should adopt Vistan's construction.

21          C.   PITTING OPERATION

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Pitting Operation (5, 12) | A process of a mechanical nature to accomplish, and concluding with, the removal of a pit from a drupe. | "Pitting operation" is defined as *the action of a ejecting a pit from a fruit by pushing the pit downward through and out the pit ejection opening in the pitting rubber through the downward stroke of a pitting knife to its lowest position for pit separation away from the fruit.* |

27          Vistan's proposed construction correctly focuses on the act of removing a pit from a fruit or

28  "drupe."  This construction is based on the clear language of the claims and specification, as well

1   as on the ordinary meaning of the terms, and states that the pitting operation concludes upon the

2   removal of a pit from a drupe.  Defendants, on the other hand, propose a greatly expanded

3   construction that improperly imports numerous limitations from the specification into the claims,

4   is inconsistent with the express claim language, and would erroneously extend the "pitting

5   operation" to the added elements and steps associated with expelling the pit from a "pitting

6   rubber."

7          As set forth in detail above, "pitting" refers to the act of removing a pit from within a

8   drupe, in the context of forcing the pit outside the skin of the drupe.  The ordinary meaning of the

9   term "operation" is "a process of a practical or mechanical nature in some form of work of

10  production." Brown Decl., Exh. C (*Random House,* at 1357).  Thus, claim language referring to

11  the "pitting operation" simply refers to the mechanical process of pitting the fruit; it does not, as

12  the Defendants' argue, broaden the concept of pitting to include the additional subject matter of

13  ejecting the pit from the holder.

14         In addition to the references cited above that establish the meaning of "pitting," the

15  specification establishes that the pitting operation focuses on expelling the pit from the fruit, not

16  the subsequent expulsion of the pit from the holder.  Col. 1:6-7.  The specification explains that

17  the "pitting knives engage the fruit gripped in the pockets to eject the pits *from the fruit,* and that

18  the knives "extend *through the fruit* in each pocket of the holder *at the end of the pitting step*."

19  Cols. 12:64-65 and 6:22-24 (emphasis added).  If there was an intent to extend the pitting

20  operation to include expulsion of the pit from the holder, then these descriptions would have

21  included that additional step.

22         Defendants' proposed expansion of the "pitting operation" is erroneous because it would

23  improperly import *multiple* structural limitations and process steps from the specification into the

24  claim.  Specifically, Defendants would require that the "pitting operation" include 1) an additional

25  directional component, "downward," 2) an additional structural element called a "pitting rubber,"

26  3) an additional structural element within the added pitting rubber called a "pit ejection opening,"

27  and 4) an additional step of "pushing the pit downward through and out the [added] pit ejection

28  opening in the [added] pitting rubber" that concludes only when the knife has reached "its lowest

1   position for pit separation away from the fruit."  As explained in detail above, it would be clear

2   error to import these multiple additional limitations into the claim.  *Intervet Inc.,* 617 F.3d at 1287;

3   *Silicon Graphics Inc.,* 607 F.3d at 792; *Kara Technology Inc.,* 582 F.3d at 1348.

4          Defendants' lengthy construction also seeks to entirely shift this construction away from

5   the step of pitting a piece of fruit to steps involving the disposition of the pit after it is expelled

6   from the fruit.  Defendants recognize that "pitting" means "removing pits from an article of fruit,"

7   and commence their proposed construction of "pitting operation" with the phrase *the action of a*

8   *ejecting a pit from a fruit*.  Nonetheless, the remainder of Defendants' proposed construction of the

9   "pitting operation" does not define the act of removing the pit from the fruit, but instead addresses

10   what happens *after* the pit is expelled from the fruit, namely, expelling the pit from the holder by

11   pushing it downward through and out the pit ejection opening in the pitting rubber.  This internal

12   contradiction further illustrates the impropriety of shifting the definition of the pitting operation

13   from a step to be performed *on a piece of fruit* to a step that focuses on ejecting the pit from the

14   "pitting rubber."  Simply put, pitting a piece of fruit and ejecting that pit out of a pitting rubber are

15   two different things.

16          Defendants' attempt to construe the term by focusing on the ejection of the pit from the

17   "pitting rubber" also contradicts the claim language stating that the "knife set performs a pitting

18   operation *on fruit in said each of the holders*."  Col. 21:40-42 (claim 5); Col. 22:44-46 (claim 12).

19   *See also* Col. 12:8-9.  This language, which clearly states that the "pitting operation" is performed

20   *on the fruit in the holder,* contradicts Defendants' proposed construction that defines how the pit is

21   ejected from the "pitting rubbers".  Finally, the specification does not support extending the pitting

22   operation beyond expelling the pit from the fruit to the point when the pit is expelled from the

23   holder and when the pitting knives reach their lowest point.  The specification describes the

24   movement of the pitting knives when they "extend[] all the way through the pitting rubbers 70 of

25   the four pockets defined by the holder" as "the position the knives would occupy immediately

26   after pushing pits downward (through the rubbers 70) from within four articles of fruit seated in

27   the pockets." Col. 5:52-57.  This description does not define that downward extension as the

28   conclusion of the "pitting operation," rather, it defines that downward extension based on the

1  subsequent step of pushing the pits downward through the pitting rubbers.  These statements do

2  not establish an intent to define the "pitting operation" to include the subsequent step of pressing

3  the pits through pitting rubbers.

4        Finally, Defendants' attempt to construe "pitting operation" as continuing even after the

5  knife assembly has passed through the opening in the pitting rubber is not consistent with the plain

6  language of Claims 5 and 12.  Each of those claims provides ample guidance as to the location of

7  the pitting operation: "each time a knife set performs a pitting operation on fruit *in said each of the*

8  *holders*."  (emphasis added).  Even if this Court were to accept Defendants' construction for

9  "holders" as containing "pockets" that include "pitting rubbers," which it should not for reasons

10  stated below, Defendants' view that the holders comprise pitting rubbers and that the pitting

11  operation takes place outside the pitting rubber/holders are contrary to the requirement in Claims 5

12  and 12 that the pitting operation be performed on fruit within the holders.

13      D.     ACTIVE ASSEMBLY

14          1.   Active Assembly Should be Given its Ordinary Meaning

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Active Assembly (5, 12) | The plain and ordinary meaning, namely, a combination of components carrying out physical movement or an action. | "Active assembly" has no antecedent basis, has no ordinary and customary meaning, and thus is indefinite.<br><br>To the extent that the Court does rule that the claim term is not indefinite, Defendants preliminary construction of this term is defined as *an actively driven assembly of elements which are mounted to the frame and positioned to, in response to control signals and as the holders pass by, move relative to the holders in order to transition the pockets from an open configuration to a closed configuration (claim 5) and to vary a gripping force exerted upon the fruit by the pockets (claim 12).* |

25        The specification and claims explain at length what the "active assembly" is and what it

26  does in the context of the claimed invention.  For example, the Summary of the Invention explains

27  that

28        The active separating assembly preferably includes cam tracks which are actively (e.g.,

pneumatically, or by solenoid) driven by a cam track actuator to vary the force with which the holders grip the fruit during and after pitting. For example, the active cam track drive assembly can cause the holders to open and close at appropriate times, including by opening briefly just after pitting while the pitting knives completely or partially retract from the pitted fruit). Col. 9:45-53.

Indeed, the specification describes multiple embodiments of the active separating assembly in detail:

> To improve the efficiency with which this class of embodiments separates the pitted fruit flesh (and pits) from the holders after pitting in accordance with the invention, each embodiment includes an actively (e.g., pneumatically, or by solenoid) driven actuator assembly 88 (as shown in FIGS. 24 and 25) is used to move (at appropriate times during the pitting cycle) a pair of cam tracks 87 to vary the force with which each fruit holder 36 grips fruit during and after pitting. Some embodiments in this class are identical to the conventional apparatus of FIGS. 1-9, modified to replace the continuous fruit holder conveyor drive with an intermittent drive, and further modified to replace notched cam tracks 85 and 85A with actuator assembly 88 and non-notched cam tracks 87 (as shown in FIGS. 24 and 25). Other embodiments in this class are identical to the apparatus of FIGS. 10-14, modified to replace the continuous fruit holder conveyor drive with an intermittent drive, and further modified to replace notched cam tracks 85 and 85A with actuator assembly 88 and non-notched cam tracks 87 (as shown in FIGS. 24 and 25). Still other embodiments in this class are identical to the apparatus of FIGS. 10-14, with the knife drive assembly replaced by the box cam knife drive assembly of FIGS. 17-22, and with the continuous fruit holder conveyor drive replaced by an intermittent drive, and with notched cam tracks 85 and 85A replaced by actuator assembly 88 and non-notched cam tracks 87 (as shown in FIGS. 24 and 25). Col. 18:50-19:9.

*See also* Col. 19:43-20:23 (describing detailed operations of the active assembly).

Each of these embodiments comprises "a combination of components carrying out physical movement or an action" that correspond to the "active assembly" recited in claims 5 and 12. These multiple embodiments support interpreting the "active assembly" as Vistan proposes and in accordance with its ordinary meaning as a combination of components carrying out physical movement or an action. *See* Brown Decl. Exh. C (*Random House* at p. 20 (defining active as "involving physical effort and action") and p. 125 (defining assembly as "a group of machine parts, esp. one forming a self-contained, independently mounted unit")).

Just as with the term "pitting operation," Defendants attempt to impose a lengthy definition that violates the well-established rules of claim constructing. Specifically, the Defendants' proposed language requiring that the assembly transitions "the pockets from an open configuration to a closed configuration" in claim 5 and that it "var[ies] the gripping force" in claim 12, should be rejected for two reasons. First, it would render significant portions of the existing claim language

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

superfluous by repeating language already present in the claim.  *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  Second, Defendants propose to erroneously impose different constructions for the term "active assembly" in the two independent claims in which it appears.  *See Phillips*, 415 F.3d at 1314 ("Because claim terms usually are used consistently throughout a patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."); *see also Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999), *cert. denied* 531 U.S. 816 (2000) ("Unless the patent otherwise provides, a claim term cannot be given a different meaning in the various claims of the same patent.").  Additionally, the Defendants' construction would erroneously import limitations from the specification to the claim by requiring in detail that the broadly claimed "active assembly" must be mounted to the frame.  *See, e.g., Intervet Inc.,* 617 F.3d at 1287.  Thus, Defendants' construction should be rejected.

2.   <u>Active Assembly Is Not Indefinite</u>

Even though the specification includes detailed descriptions of the "active assembly" and the fact that the Defendants offer their own detailed and lengthy claim construction, Defendants contend that "active assembly" is indefinite.  There is simply no basis for the Court to hold this term to be indefinite.

Patents must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112 ¶ 2.  The purpose of this "definiteness" requirement is to "ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."  *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citation omitted).

The definiteness requirement does not compel "absolute clarity," and "the definiteness of claim terms depends on whether those terms can be given any reasonable meaning."  *Datamize LLC,* 417 F.3d at 1347.  Moreover, even "a difficult issue of claim construction does not *ipso facto* result in a holding of indefiniteness."  *Id.*  "If the meaning of the claim is discernible, even though

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1  the [claim construction] task may be formidable and the conclusion may be one over which

2  reasonable persons will disagree . . . the claim []is sufficiently clear to avoid invalidity on

3  indefiniteness grounds." *Id. (citing Exxon Research & Eng'g Co.,* 265 F.3d at 1375).

4     In analyzing an assertion that a claim is indefinite, the Court should determine whether one

5  skilled in the pertinent art would understand the scope of the claim when it is read in light of the

6  specification. *Energizer Holdings, Inc. v. Int'l. Trade Comm'n.,* 435 F.3d 1366, 1370 (Fed. Cir.

7  2006). Only those claims that are **"not amenable to construction,"** or that are **"insolubly**

8  **ambiguous,"** are indefinite. *Datamize LLC,* 417 F.3d at 1347. *See also Exxon Research & Eng'g*

9  *Co. v. United States,* 265 F.3d 1371, 1375 (Fed. Cir. 2001) (a claim need not be plain on its face in

10  order to avoid condemnation for indefiniteness, but must be amenable to construction).

11     The statutory presumption of patent validity, *see* 35 U.S.C. § 282, supports this difficult

12  threshold. "By finding claims indefinite only if reasonable efforts at claim construction prove

13  futile, [the courts] accord respect to the statutory presumption of validity and [] protect the

14  inventive contribution of patentees, even when the drafting of their patents has been less than

15  ideal." *Exxon Research & Eng'g Co.,* 265 F.3d at 1375. Moreover, the difficulty of proving a

16  patent claim indefinite serves to comply with the requirement that a patent claim be invalidated

17  only upon "clear and convincing" evidence. *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d

18  at 1348 (citation omitted). Simply put, proof of indefiniteness must meet an "exacting standards":

19     A claim is not indefinite merely because parties disagree concerning its
   construction. An accused infringer must thus demonstrate by clear and convincing

20     evidence that one of ordinary skill in the relevant art could not discern the
   boundaries of the claim based on the claim language, the specification, the

21     prosecution history and the knowledge in the relevant art.

22  *Haemonetics Corp. v. Baxter Health Care Corp.,* 607 F.3d 776, 783 (Fed. Cir. 2010).

23     Far from being insolubly ambiguous, the claimed "active assembly" is exhaustively

24  described in the sections of the specification referenced above. Moreover, dependent

25  claims 7 and 13 provide even more specificity to the active assembly by narrowly claiming

26  that the "active assembly" of claims 5 and 12, respectively, comprise:

27     a pair of tracks mounted to the frame with freedom to move between a first position

28     in which the tracks cause the pockets of said each of the holders to be in a closed

configuration, and a second position in which said tracks cause the pockets of said each of the holders to be in an open configuration; and

an actuator coupled to the tracks and configured to move the tracks between the first position to the second position in response to control signals.

Col. 21:59-67; Col. 22:57-65.

Finally, there is no basis to find the term "active assembly" indefinite because it is supported in the specification by references to "an active separating assembly." *Manual of Patent Examining Procedure* (MPEP), section 2173.05(e)(8th Ed., rev. 8, July 2010) ("There is no requirement that the words in the claim must match those used in the specification disclosure. Applicants are given a great deal of latitude in how they choose to define their invention so long as the terms and phrases used define the invention with a reasonable degree of clarity and precision.."). *See also Kathrein-Werke KG v. Radiacion y Microondas S.A.*, No. 07 C 2921, 2010 WL 2011939, at *5 (N.D. Ill. May 17, 2010) (construing "stripline sections", "stripline segments", and "stripline elements" to be the same because the intrinsic evidence showed patentee "obstinately" used the terms to mean the same thing).

E.   HOLDERS

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Holders (5, 12) | A structure wherein fruit may be placed for transport through a pitting apparatus. | "Holders" is defined as an assembly of elements within a pitting apparatus which translate together around a closed loop relative to a frame thereof and which have pockets therein which hold fruit for pitting of the fruit. |

To the extent any construction of "holders" is necessary, the claims clearly state that the holder is the "structure wherein fruit may be placed for transport through the pitting apparatus." Specifically, the holders "having pockets dimensioned to hold soft fruit," Col. 21:24 and 22:29, and are coupled to a "holder drive assembly" that is configured "to translate the holders intermittently around a closed loop such that each of the holders passes the pitting knife assembly while translating intermittently around the loop." Col. 21:34-38 and 22:38-42.  The specification further explains that each holder contains pockets to hold fruit and, as discussed below, that the conveyor "translates" the holders.  Col. 1:59-60, 3:17-21, 12:44-46; 19:10-14.

1    Defendants' proposed construction should be rejected because it introduces additional

2    elements to the claims and is redundant to the express claim language.  First, neither the

3    specification nor claims describe the "holder" as "an assembly of elements."  Importing this

4    extraneous phrase adds unnecessary ambiguity to the clear claim language.  Second, Defendants'

5    proposed construction should be rejected because it would render significant portions of the claim

6    language superfluous.  *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir.

7    2009) ("A claim construction that gives meaning to all the terms of the claim is preferred over one

8    that does not do so.").  Both of the asserted claims include "holders *having pockets configured to*

9    *hold soft fruit,"* Col. 21:24, and Col. 22:29, which would be duplicated by Defendants' proposed

10   requirement that the holders "have pockets therein which hold fruit for pitting of the fruit."

11   Second, the proposed requirement that the holders "translate together around a closed loop" is not

12   inherently required by the term "holder" and would render superfluous language in both of the

13   asserted claims reciting "a holder drive assembly coupled to the holders and configured to

14   translate the holders intermittently *around a closed loop.*"  Col. 21:34-36; Col. 22:39-41.

15   Defendants' attempt to introduce the holder as "an assembly of elements" also conflicts

16   with their argument that "active assembly" is indefinite.  Despite professing ambiguity in the '949

17   patent use of the term "assembly," defendants consistently incorporate the term "assembly" in their

18   own construction of the claims.

19   F.    POCKETS

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Pockets (5, 12) | Individual compartments of a holder, each of which may hold a single piece of fruit.  The pockets have at least one moveable side to allow the pockets to open and close, where when "closed" the pockets grip a piece of fruit contained therein. | "Pockets" is defined as recesses within a holder of a pitting apparatus which include pitting cups or rubbers and which hold fruit to be pitted therein and which can transition from an open configuration to a closed configuration. |

27   To the extent that "pockets" needs to be independently construed, claim 5 states that the

28   holders have "pockets dimensioned to hold soft fruit" that the pockets are "configured to be

movable between open configuration and a closed configuration;" and that the active assembly is configured to cause the pockets "to be in the closed configuration during the pitting operation  and to move the pockets . . . from the closed configuration to the open configuration after the pitting operation." Col. 21:24-27 and 42-48.  Claim 12 states that the pockets are configured "to exert variable gripping force on a specimen of fruit held thereby" and that the active assembly is "configured to move relative to the holders so as to vary the gripping force exerted by the pockets on specimens of fruit held in said holders." Col. 22:31-32 and 48-52.  The specification further explains that each pocket is dimensioned to hold firmly one of the prunes or other articles to be pitted when the pocket is in a closed configuration, that the pockets may be "closed to grip tightly the fruit being pitted," and be controlled to "open when desired (so as not to grip the fruit therewithin) and to close when desired (to grip the fruit therewithin)." Cols. 1:61-62, 6:13-14; 19:11-14.  Thus, each portion of Vistan's proposed construction that the pockets are individual compartments of a holder, that the pockets may hold a single piece of fruit, that the pockets have at least one moveable side to allow them to open and close, and that the "closed" pocket grips the fruit are directly supported by the claim language and the specification's explanation of how the pockets work to grip the piece of fruit.

Defendants' proposed construction once again attempts to import additional limitations from the specification – in this instance the additional element of a "pitting cup or rubber."  While the specification describes embodiments containing this structure, there is nothing in the claims that requires it.  Once again, Defendants' attempt to narrow the scope of the claims by reading limitations from the specification should be rejected.  *See, e.g., Intervet Inc. v. Merial Ltd.,* 617 F.3d at 1287.

G.   OPEN CONFIGURATION

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Open configuration (5) | A state of a pocket wherein the pocket offers little or no restrictions or resistance to fruit entering or leaving the pocket.  This is the default state of a pocket. | "Open configuration" is defined as a configuration of pockets of the holders where the pockets have been increased in size to allow fruit to pass into and out of the pockets. |

As set forth in the discussion of "pocket," above, the pockets are configured so that they can open and close, and the pockets exert force on a piece of fruit when they are in a "closed" configuration.  To the extent "open configuration" needs further construction, the open configuration is simply the state of the pocket wherein there is little or no resistance to fruit entering or leaving the pocket.  *See* Col. 19:11-14 (stating that the pockets can be controlled "to open when desired (so as not to grip the fruit therewithin) and to close when desired (to grip the fruit therewithin").  Moreover, the "open" configuration is the "default" state of the pocket.  *See* Col. 1:63-2:1 and Col. 12:49-57 (stating that the springs mounted between the main body of the holder 36 and the carrier 54 (or 56) serve to "spring-load the pockets into their open configuration"); Col. 6:19-22 (the holder's springs briefly "relax" and then are recompressed thereby briefly opening the pockets); Col. 7:4-7 ("More generally, as each pair of adjacent holders 36 translates along their looped path, the pockets of both holders are simultaneously closed (to perform the pitting operation," which indicates that the pockets were in an open state until closed in preparation for the pitting step).  *See also*  Col. 19:30-42 (stating that the pockets are in an open configuration as they enter the pitting head housing prior to pitting).

Defendants' proposed construction that the "open configuration" is where the pockets "have been increased in size" incorrectly implies that the default state of the pockets is to be in a closed configuration.  This proposed construction is inconsistent with the repeated descriptions within the specification clearly explaining that an action is applied to the structure in order for them to close.  Moreover, the Defendants' construction contradicts the language of claim 8, which depends from claim 5, and which states that "the pockets of said each of the holders *are biased in the open configuration, the track exerts force on the holders thereby moving the pockets into the closed configuration. . . .*"  Col. 22:1-4.

H.    VARY THE GRIPPING FORCE

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Vary the Gripping Force (12) | The plain and ordinary meaning:<br><br>Changing the pressure exerted upon an object, | "Vary the gripping force" is defined as *movement of the active assembly relative to the holders to change the force exerted by the pockets upon a fruit.* |

| | such as a piece of fruit in a pocket, where the pressure holds or binds (grips) the object or piece of fruit. | |
|---|---|---|

Claim 12 states that the active assembly is "positioned to engage the holders as the holders pass the pitting knife assembly," that the pockets within the holders are "configured to exert variable gripping force on a specimen of fruit," and the that active assembly is "configured to move relative to the holders so as to *vary the gripping force* exerted by the pockets on the specimens of fruit held in said holders during and after the pitting operation . . . ." Col. 22:47-53 (emphasis added).  The specification explains how the active assembly and the cam tracks are used to "vary the force with which each fruit holder 36 grips fruit during and after pitting,"  Col. 18:52-58, and that the "the fruit holders have controllable pockets which can be controlled (by action of pitting head cam tracks on each holder) to open when desired (so as not to grip the fruit therewithin) and to close when desired (to grip the fruit therewithin)." Col. 19:10-14.  The specification also sets forth a detailed description of how one of the embodiments achieves the open and closed configurations.  *See* Col. 19:31-20:3 (discussing mechanical actions used to achieve transition of pockets to and from the open configuration).  Thus, the claim language and the specification establish that the active assembly is used to change the configuration of the pockets to grip the fruit with more or less force.  Thus, "vary the gripping force" refers to the change in force on the fruit within the pockets caused by claimed active assembly, and simply means "changing the pressure exerted upon an object, such as a piece of fruit in a pocket, where the pressure holds or binds (grips) the object or piece of fruit."  This construction is, of course, also supported by the ordinary meaning of the terms vary, gripping and force.  *See, e.g.,* Brown Decl., Exh. C (*Random House* at pp. 2107, 841, and 748 (defining vary as "to change or alter, as in form, appearance character or substance," gripping as "the act of grasping, a seizing and holding fast," and force as "strength or power exerted upon an object.")).

Defendants' proposed construction is improper because it does not define what the term "vary the gripping force" means, but purports to describe how the change in the gripping force is achieved.  Claim 12 already specifies that the active assembly is "configured to move relative to

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

the holders so as to *vary the gripping force* exerted by the pockets on the specimens of fruit held in said holders during and after the pitting operation."  Col. 22:47-52.  Thus, rather than clarifying the meaning of the term "vary the gripping force," Defendants' construction simply repeats the claim language describing the movement and configuration of the active assembly.  This construction should be rejected.  *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d at 1378 ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

I.   DURING THE PITTING OPERATION AND AFTER THE PITTING OPERATION

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| During the Pitting Operation (5,12) | The plain and ordinary meaning of "during" used along with the term "pitting operation" (discussed *supra*)<br><br>A period of time coincident with the action or process of pitting fruit. | "During the pitting operation" is defined as *the time period while "the downward (pitting) stroke of each knife" is occurring.* To the extent that the pitting operation is construed to end before the knives reach their "lowest position" and before the end of the downward (pitting) stroke of each knife, then the claim terms "during the pitting operation" and "after the pitting operation" are indefinite. |
| After the Pitting Operation (5,12) | The plain and ordinary meaning of "after" used along with the term "pitting operation." (discussed *supra*)<br><br>Any moment in time following the end of the process of pitting fruit. | "After the pitting operation" is defined as *the time period of "the upward (retracting) stroke which follows the pitting stroke".*<br><br>To the extent that the pitting operation is construed to end before the knives reach their lowest position and before the end of the downward (pitting) stroke of each knife, and before the commencement of the upward (retracting) stroke which follows the pitting stroke, then the claim terms "during the pitting operation" and "after the pitting operation" are indefinite. |

Vistan does not believe that the term "during the pitting operation," or "after the pitting operation need to be construed independently from the term "pitting operation."  The process of claim construction is "simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims."  *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Courts "are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *O2 Micro Int'l., Ltd. v. Beyond Innovation Tech.*

1  *Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008).  In short, claim construction should not become "an

2  obligatory exercise in redundancy."  *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d at 1568.

3    Here, the parties agree that the term "pitting operation" needs to be construed.  The plain

4  language of "during" and "after" the pitting operation does not need to be additionally explained in

5  order to properly construe the scope of these claims, as the words "during" and "after" are

6  "common words familiar to most English speakers such that they do not require construction."

7  *Univ. of Pittsburgh v. Varian Medical Systems, Inc.,* 2011 U.S.Dist. LEXIS 52078, **42-43

8  (W.D.Pa. 2011), ) (finding that there was no need to construe the common terms "configured," "a

9  base," "secured to," and "section") *modified on other grounds*, 2011 U.S.Dist. LEXIS 52095

10  (W.D.Pa., May 16, 2011.  However, if the Court determines that further construction is necessary,

11  these terms should be construed in accordance with their plain and ordinary meaning as Vistan

12  proposes.  *See* Brown Decl., Exh. C (*Random House* at p. 608 and 63 (defining during as "at some

13  time or point in the course of," and "after" as "later in time than, in succession to") and *Encarta*

14  (defining during as "at some point or moment within a particular period of event" and after as

15  "later in time than").

16    Vistan's proposed constructions are straight-forward interpretations based on the common

17  meaning of "during" and "after" and its proposed construction of "pitting operation."  In contrast,

18  Defendants attempt to define these terms independently of their proposed construction of "pitting

19  operation," with references to a "downward (pitting) stroke," and an "upward (retracting) stroke"

20  that do not appear in the claim language or in Defendants' proposed construction of the "pitting

21  operation."  Defendants' construction would serve to add yet more extraneous elements to the

22  claim and to further obscure the meaning.  They should be rejected.

23    Finally, there is no basis to Defendants' assertion that Vistan's proposed construction of the

24  "during" and "after" pitting would render the claim indefinite.  As explained in the discussion of

25  "active assembly," above, a claim is indefinite only if it is "not amenable to construction" or

26  "insolubly ambiguous."  *See Datamize LLC,* 417 F.3d at 1347.  Simply adding the temporal

27  limitations of "before" and "after" the "pitting operation" does not in any render the term indefinite

28  under the controlling case law.

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1    **IV.    CONCLUSION**

2        Vistan's proposed constructions are supported by the claim language, the specification,

3    and, where appropriate for commonly used terms, extrinsic evidence in the form of dictionary

4    definitions.  Defendants' constructions violate the basic rules of claim construction by importing

5    numerous limitations, rendering claim language superfluous, and creating different constructions

6    of claim terms for different claims.  Vistan requests that the Court adopt its proposed constructions

7    and reject those proposed by Defendants.

8    DATED: November 23, 2011                    HANSON BRIDGETT LLP

9

10                                        By:____*/s/ Robert A. McFarlane*_____

11                                            ROBERT A. McFARLANE
                                            Attorneys for Plaintiff / Counterdefendant
12                                            VISTAN CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A**

**'949 Patent, Claim 5**

A fruit pitting apparatus, including:

    a frame;

    holders having pockets dimensioned to hold soft fruit, each of the pockets being configured to be movable between an open configuration and a closed configuration;

    a pitting knife assembly mounted to the frame and including a knife set and a knife drive assembly, wherein the knife set includes one or more pitting knives and the knife drive assembly is coupled to the knife set and configured to drive the knife set along a pitting path relative to each of the holders;

    a holder drive assembly coupled to the holders and configured to translate the holders intermittently around a closed loop such that each of the holders passes the pitting knife assembly while translating intermittently around the loop, and each of the holders is stationary relative to the frame each time the knife set performs a pitting operation on fruit in said each of the holders;

    an active assembly positioned to engage the holders as the holders pass the pitting knife assembly, and configured to cause the pockets of each of the holders to be in the closed configuration during the pitting operation and to move the pockets of said each of the holders from the closed configuration to the open configuration after the pitting operation thereby improving efficiency of separation of pitted fruit flesh from the holders after said pitting operation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B**

**'949 Patent, Claim 12**

A fruit pitting apparatus, including:

a frame;

holders having pockets dimensioned to hold soft fruit, each of the pockets being configured to exert variable gripping force on a specimen of fruit held thereby;

a pitting knife assembly mounted to the frame and including a knife set and a knife drive assembly, wherein the knife set includes at least one pitting knife and the knife drive assembly is coupled to the knife set and configured to drive the knife set along a pitting path relative to each of the holders;

a holder drive assembly coupled to the holders and configured to translate the holders intermittently around a closed loop such that each of the holders passes the pitting knife assembly while translating intermittently around the loop, and each of the holders is stationary relative to the frame each time the knife set performs a pitting operation on fruit in said each of the holders;

an active assembly positioned to engage the holders as the holders pass the pitting knife assembly, and configured to move relative to the holders so as to vary the gripping force exerted by the pockets on specimens of fruit held in said holders during and after the pitting operation, thereby improving efficiency of separation of pitted fruit flesh from the holders after said pitting operation.

VISTAN CORPORATION'S CLAIM CONSTRUCTION BRIEF