**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VISTAN CORPORATION.,

        Plaintiff(s),

    v.

FADEI USA, INC. et al.,

        Defendant(s).

_____/

Case No.  C 10-4862 JCS

**CLAIM CONSTRUCTION ORDER**

## I.    INTRODUCTION

    On October 27, 2010, Plaintiff Vistan Corporation ("Plaintiff") filed a complaint alleging infringement by Defendants Fadei, Inc., Pan American engineering and Equipment Co., Manuel Silva and Mariani Packing Co., Inc. ("Defendants") of U.S. Patent No. 5, 870,949 ("the '949 Patent").[1]  Before the Court is the task of construing certain terms used in the '949 Patent.[2]

---

    [1]The asserted claims are claims 5 and 12.

    [2]The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**United States District Court**
For the Northern District of California

1    **II.**      **OVERVIEW OF THE TECHNOLOGY**

2        **A.**      **The '949 Patent**

3       The invention disclosed in the '949 Patent is entitled "Pitting Apparatus With Box Cam;

4   Wiping Blade, or Separating Assembly." Vistan's Opening Claim Construction Brief ("Pl.'s Br."),

5   Declaration of Michael J. Brown ("Brown Decl."), Ex. A, the '949 Patent.

6       The patented invention is designed to remove pits from prunes or dates ("or similar soft

7   fruit"). '949 Patent 1:6-8. The patented invention contains at least one "box cam" assembly for

8   driving the pitting knives to the holders containing the fruit, a separating assembly, which improves

9   the efficiency of separation of the pitted fruit flesh from the holders after pitting, and a wiping blade

10   that wipes pits from the holders after the fruit has been pitted. The invention has two main

11   embodiments – one that is continuous, meaning that the holders are driven continuously during

12   pitting, and one in which the holders can be driven intermittently so that they are stationary during

13   pitting.

14   **III.**      **LEGAL STANDARDS**

15        **A.**       **Claim Construction Standards**

16       A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics*

17   *Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a

18   question of law to be determined by the court. *Id*. The second step is an analysis of infringement, in

19   which it must be determined whether a particular device infringes a properly construed claim. *Id*.

20   Infringement analysis is a question of fact. *Id*.

21       "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

22   which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

23   (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

24   1111, 1115 (Fed. Cir. 2004)). Generally, claim terms are given the ordinary and customary meaning

25   that would be ascribed to them by a person of ordinary skill in the field of the invention. *Id*. at 1313;

26   *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[U]nless

27

28

**United States District Court**

For the Northern District of California

1    compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as

2    understood by an artisan of ordinary skill").

3        The most "significant source of the legally operative meaning of disputed claim language" is

4    the intrinsic evidence of record, that is, the claims, the specification and the prosecution history.

5    *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  This is because "the

6    person of ordinary skill in the art is deemed to read the claim term not only in the context of the

7    particular claim in which the disputed term appears, but in the context of the entire patent, including

8    the specification." *Phillips*, 415 F.3d at 1313.  In some cases, the specification may reveal a "special

9    meaning" given by the inventor that differs from the meaning the term might otherwise possess. *Id.*

10   at 1316; *see also Irdeto Access, Inc. v. Echostar Satellite Corp*., 383 F.3d 1295, 1300 (Fed. Cir.

11   2004) (holding that where a disputed claim term has "no previous meaning to those of ordinary skill

12   in the art, its meaning, then, must be found elsewhere in the patent.").  In such instances, "the

13   inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.  Similarly, a specification may reveal

14   "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.*

15       "[T]he Federal Circuit has held that if commonly understood words are used, then the

16   'ordinary meaning of claim language as understood by a person of skill in the art may be readily

17   apparent even to lay judges, and claim construction in such cases involves little more than the

18   application of the widely accepted meaning of commonly understood words.'" *Board of Trustees of*

19   *Leland Stanford Jr. Univ. v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal.

20   2007) (quoting *Phillips*, 415 F.3d at 1314);  *see also United States Surgical Corp. v. Ethicon, Inc.*,

21   103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that "[c]laim construction is a matter of resolution of

22   disputed meanings and technical scope, to clarify and when necessary to explain what the patentee

23   covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise

24   in redundancy.").  Thus, in *Board of Trustees of Leland Stanford Junior University v. Roche*

25   *Molecular Systems, Inc.*, the court held that a claim term did not need construction where it was

26   "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution

27   history." 528 F. Supp. 2d at 976.

28       A person of ordinary skill in the art also looks to the prosecution history of a patent to

understand how the patent applicant and the Patent Office understood the claim terms. *Phillips*, 415

United States District Court

For the Northern District of California

F.3d at 1314.  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

While claims are to be construed in light of the specification, courts must be careful not to read limitations from the specification into the claim.  *Phillips*, 415 F.3d at 1323.  If a patent specification describes only a single embodiment, that does not mean the claims of the patent necessarily must be construed as limited to that embodiment.  *Id*.  Rather, it is to be understood that the purpose of the specification "[is] to teach and enable those of skill in the art to make and use the invention" and that sometimes, the best way to do that is to provide an example.  *Id*.  Similarly, the Federal Circuit has cautioned that "patent coverage is not necessarily limited to inventions that look like the ones in the figures," noting that taking such an approach to claim construction would amount to "import[ing] limitations onto the claim from the specification, which is fraught with danger."  *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as such evidence is not used to "enlarge, diminish, or vary the limitations in the claims."  *Markman v. Westview Instruments, Inc.,*52 F.3d 967, 980 (Fed. Cir. 1995) ("*Markman I*");  *see also Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002) ("Patent documents are written for persons familiar with the relevant field; the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field.  Thus resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention.").  As the court explained in *Markman*, "[extrinsic] evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history."  52 F.3d at 980.  The Federal Circuit has warned, however, that such evidence is generally "less reliable than the patent and its prosecution history. . ."  *Phillips*, 415 F.3d at 1318.  Thus, courts are  free to consult dictionaries and technical treatises so long as they are careful not to elevate them "to such

United States District Court

For the Northern District of California

1    prominence . . . that it focuses the inquiry on the abstract meaning of [the] words rather than on the

2    meaning of the claim terms within the context of the patent."  *Phillips*, 415 F.3d at 1321.

3        In recent years, the Federal Circuit has offered considerable guidance on the role extrinsic

4    evidence should play in claim construction.  In *Phillips*, the Federal Circuit rejected a methodology

5    that it had previously set forth in *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed.

6    Cir. 2002) for the use of extrinsic evidence, warning that it placed too great an emphasis on

7    dictionary definitions and other treatises.  415 F.3d at 1321.  The Federal Circuit explained its

8    conclusion as follows:

> Although the concern expressed by the court in *Texas Digital* was valid, the methodology it
> adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and
> encyclopedias and too little on intrinsic sources, in particular the specification and
> prosecution history. While the court noted that the specification must be consulted in every
> case, it suggested a methodology for claim interpretation in which the specification should be
> consulted only after a determination is made, whether based on a dictionary, treatise, or other
> source, as to the ordinary meaning or meanings of the claim term in dispute. Even then,
> recourse to the specification is limited to determining whether the specification excludes one
> of the meanings derived from the dictionary, whether the presumption in favor of the
> dictionary definition of the claim term has been overcome by "an explicit definition of the
> term different from its ordinary meaning," or whether the inventor "has disavowed or
> disclaimed scope of coverage, by using words or expressions of manifest exclusion or
> restriction, representing a clear disavowal of claim scope." 308 F.3d at 1204. In effect, the
> *Texas Digital* approach limits the role of the specification in claim construction to serving as
> a check on the dictionary meaning of a claim term if the specification requires the court to
> conclude that fewer than all the dictionary definitions apply, or if the specification contains a
> sufficiently specific alternative definition or disavowal. . . . That approach, in our view,
> improperly restricts the role of the specification in claim construction.

*Id* at 1320.

These principals were illustrated in *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed.

Cir. 2005).  In that case, the Federal Circuit held that the word "board" encompassed only "wood

decking materials cut from a log," even though a few dictionary definitions swept more broadly to

include similarly-shaped items made of materials other than wood.  In reaching this conclusion, the

Federal Circuit rejected the plaintiff's argument that the broader definition should be adopted

because there had been no disclaimer of claim scope during the prosecution of the patent.  *Id*.  The

Court noted that the parties agreed that the ordinary and customary meaning of "board" was an item

made of wood.  *Id*.  Further, it was undisputed that the written description and prosecution history

consistently used "board" to refer to an item made of wood.  *Id*.  The court reasoned:

> What *Phillips* now counsels is that in the absence of something in the written description
> and/or prosecution history to provide explicit or implicit notice to the public – *i.e.*, those of

5

ordinary skill in the art – that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

*Id.*

Similarly, in *AquaTex Indus., Inc. v. Techniche Solutions*, the Federal Circuit held that the term "fiberfill" referred only to synthetic materials and did not encompass natural materials because the patentee consistently used the term in this way in the specification. 419 F.3d 1374, 1380 (Fed. Cir. 2005). The court reached this conclusion even though the specification stated that the composition of the fiberfill was not known to be critical, noting that although there was no disavowal of fiberfill that used natural material, the description consistently used the term with reference to synthetic material, and extrinsic dictionary definitions also supported this construction. *Id.* On the other hand, in *Phillips*, the Federal Circuit held that

the term 'baffle' did not require any specific angle – even in view of the written description's limited disclosure of baffles oriented at right angles to the walls – because the ordinary meaning of the term 'baffle,' as reflected in a dictionary definition to which the parties stipulated and as supported by the overall context of the written description, was simply 'objects that check, impede, or obstruct the flow of something.'

*Nystrom*, 424 F.3d at 1145 (quoting *Phillips*, 415 F.3d at 1324).

"A word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). On the other hand, where a claim term is used "in two contexts with a subtle but significant difference" the term "should not necessarily be interpreted to have the same meaning in both phrases." *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002). Further, the modifiers "first" and "second" before a claim term is a "common patent-law convention to distinguish between repeated instances of an element or limitation." *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) (holding that "first pattern" and "second pattern" is equivalent to "Pattern A" and "Pattern B"); *see also Swapalease, Inc. v. Sublease Exchange.com, Inc.*, 2009 WL 204408, *11 (S.D. Ohio, Jan. 27, 2009) (holding that "first webpage" and "second webpage" are specific webpages and that "first webpage" is different from "second webpage.").

**B.**     **Indefiniteness Standards**

The requirement that claims be sufficiently "definite" is set forth in 35 U.S.C. § 112, ¶ 2, which provides that, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001).  In order to "accord respect to the statutory presumption of patent validity," a claim should be found indefinite "only if reasonable efforts at claim construction prove futile." *Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Thus, a claim is not indefinite simply because its meaning is not ascertainable from the face of the claims.  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003).   Further, a claim is not indefinite simply because it covers "some embodiments that may be inoperable." *Exxon Research and Engineering Co.*, 265 F.3d at 1382.  A claim is indefinite, however, if it is "insolubly ambiguous, and no narrowing construction can properly be adopted." *Amgen*, 314 F.3d at 1342 (citations omitted).  Although the Court must construe claims in light of the specification and in a manner that will preserve their validity, if possible, this Court "may not import wholesale the specification into the claims." *Texas Instruments Inc. v. Cypress Semiconductor Corp*., 5 F.3d 1504 (Fed. Cir. 1993) (citing *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053  (Fed. Cir. 1989).

**IV.**     **DISPUTED CLAIM TERMS**

**A.**     **Disputed Claims From the '949 Patent**

Consistent with Patent Local Rule 4-3 and the Court's Amended Case Management and Pretrial Order, the Court addresses the following claim terms below: 1) "fruit" 2) "pitting" and "pitting operation" 3) "during the pitting operation" and "after the pitting operation 4) "active assembly"; 5) "holders"; 6) "pockets" 7) "open configuration" 8) "vary the gripping force."

//

//

//

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

### 1. "Fruit"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Fruit**<br><br>(Claims 5, 12) | "Drupe capable of having the pit removed without slicing or cutting the drupe open" | "The term fruit is defined to mean one item or article of fruit" |

The asserted claims of the '949 Patent recite the term "fruit" simply as "soft fruit."  '949 Patent at 21:24; 22:29.  The asserted claims to not discuss in any detail what type of fruit is used in the claimed pitting machine.  The Court concludes that the patents' use of the term "fruit" requires no further construction.  The word "fruit" is not ambiguous within the context of the '949 patent, nor is it a word that would require explanation for the jury to understand it.  Further, the patented invention is a fruit pitting machine, thus a jury would have no difficulty understanding that the fruit to be used in the claimed machines must have pits.

Citing the dictionary, Plaintiff argues that the word "fruit" should be construed to be a "drupe," which is a term derived from the word "drupaceous" that describes the category of fruit contemplated by the '949 Patent, *i.e.*, a fruit [having] a thin outer skin, soft pulpy middle, and a hard stony central part that encloses a seed."  *See* Brown Decl., Exh. B (Encarta, World English Dictionary (1999), at p. 551).  In apparent agreement that the drupaceous fruit category encompasses fruits that are not used in the claimed pitting machine, Plaintiff seeks a definition of the term "fruit" that would include the limitation "a drupe capable of having the pit removed without slicing or cutting the drupe open."  Pl.'s Br. at 8; Pl.'s Reply at 1-2.

The Court is not persuaded by the Plaintiff's argument that the word "fruit" must be replaced with the word "drupe."  Although Plaintiff might be correct that the fruits referenced in the patent, dates and prunes, are included in the category known as "drupes," the Court sees no reason to alter the chosen language of the patent to explain a term that is not ambiguous.  Moreover, the word "drupe" is broader than merely a reference to dates and prunes, as discussed in the patent specification.  The term "drupe" includes almonds, raspberries and blackberries for example, none of which, presumably, would be used in the patented fruit-pitting machine.

Nor is the Court persuaded by Defendants' suggestion that the word "fruit" must be defined

as "an article or piece of fruit."  It is clear from the invention that each piece of fruit is pitted by the apparatus.  No further explanation of this term is required or necessary.

### 2.    "Pitting" and "Pitting Operation"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "Pitting" | "The act of removing a pit from within a drupe, in the context of forcing the pit outside the skin of the drupe. Pitting does not comprise slicing or otherwise opening the fruit to remove a pit." | No construction OR "Removing pits from an article of fruit" |
| "Pitting Operation"<br><br>(Claims 5, 12) | "A process of a mechanical nature to accomplish, and concluding with, the removal of a pit from a drupe." | "The action of a [sic] ejecting a pit from a fruit by pushing the pit downward through and out the pit ejection opening in the pitting rubber through the downward stroke of a pitting knife to its lowest position for pit separation away from the fruit." |

The dispute with respect to the claim terms "pitting" and "pitting operation" centers on whether the term is defined by the position of the knives as Defendants suggest, or whether these terms are defined with respect to the position of the fruit pit, as Plaintiff posits.

"Pitting" must be construed to mean "removing a pit from a fruit."  The parties are in agreement, at least in part, that "pitting" refers to the act of removing a pit from a piece of fruit. Where the parties' positions diverge is how the "pitting operation" is defined in terms of its duration. Does it last until the pit is ejected from the fruit entirely and the pitting knives are at their lowest position (Defendants) or does it end when the pit is forced outside of the skin of the piece of fruit, without slicing or otherwise opening the fruit (Plaintiff)?

The Court finds problems with the constructions proposed by both sides.

Plaintiff argues that the specification defines "[t]he invention" as "an apparatus for removing pits from prunes or similar fruits such as dates," '949 Patent, 1:6-7, and explains that the claimed invention executes pitting by forcing the pit outside the skin of the fruit.  Pl.'s Brief at 9 (citing '949 Patent at 3:58-60 ("reciprocating pitting knife assembly in housing 22 engages the translating prunes (or other articles) to push out the pit from within each prune); 12:64-65 ("the pitting knives engage

9

United States District Court

For the Northern District of California

1   the fruit gripped in the pockets to eject the pits from the fruit"); 18:31-35 ("This knife path desirably

2   results in cleaner pitting of prunes (by vertical ejection of their pits), with less horizontal motion

3   (and indeed without significant horizontal motion) of the knife relative to each prune when the knife

4   is engaged with the prune. . . .")).  Plaintiff contends that the specification supports its construction.

5          Plaintiff argues that its proposed construction is also supported by extrinsic evidence and that

6   it is consistent with the ordinary meaning of "pitting."  *Id.* (citing Brown Decl., Exh. B, at p. 1374

7   ("to remove the kernel or stone from a fruit"); and Exh. C, Random House Webster's Unabridged

8   Dictionary, at 1476 (2d ed. 1998) ("to remove the pit from a fruit or fruits").

9          Plaintiff's proposed construction introduces terms not used in the patent at all – "drupe,"

10  "slicing or otherwise opening the fruit to remove a pit" and "forcing the pit outside the skin of the

11  drupe."  The Court declines to introduce terms and concepts used nowhere in the claims.  The Court

12  similarly rejects the Defendants' construction and declines to define the "pitting operation" in terms

13  of whether the knives are in the lowest position.  The Court is not persuaded by Defendants'

14  citations to the specification that the pitting operation must be defined so that it ends when the

15  knives reach their lowest point and have ejected the fruit from the pitting rubbers.  In support for this

16  position, Defendants cite to the following passage from the specification:

17          Next, with reference to FIGS. 5, 6, and 9, we describe *the pitting operation* in more detail (in
            an implementation in which motor 24 continuously translates holders 36 around the loop
18          defined by sprocket assemblies 32 and 34).  FIG. 5 shows a holder 36 and one row of four
            knives 102 *in their lowest position* (extending all the way through pitting rubbers 70 of the
19          four pockets defined by the holder), *in the position the knives would occupy immediately
            after pushing pits downward (through the rubbers 70) from within four articles of fruit
20          seated in the pockets*.  FIG. 6 shows one knife 102 of each of the two rows of knives 102,
            also in the lowest knife position.

21

22  '949 Patent 5:47-58 (emphasis added).  Defendants argue that this passage, which states that it is a

23  description of "the pitting operation in more detail" is "exactly what should define it" and confirms

24  that the Defendants' construction is correct.  Defs.' Br. at 5.  Defendants argue that this description

25  of the "pitting operation" applies with equal force to the intermittent patented invention claimed in

26  claim 5 and 12 and that this description from the specification makes it clear that the pitting

27  operation "lasts at least until the instant when the pitting knives are in the lowest position along the

28  pitting path."  However, nowhere in the quoted passage is there language that supports Defendants'

    conclusion.  The quoted passage states that "Fig. 6 shows one knife 102 of each of the two rows of

knives 102, also in the lowest knife position" but does not say that this position defines the end of the pitting operation. Because the specification describes the knives in their lowest position in the position that the knives would occupy right *after* pushing pits downward through the rubbers, and does not state that this is the end of the pitting operation, the Court is not persuaded by Defendants' citation to the specification in support of their position.

Nor is the Court persuaded by Defendants' reliance on Figure 23, which similarly describes the knife tip moving downward vertically, "toward its lowest position (at each of pitting times t1 and t2), and very rapidly upward from its lowest position." While it is clear from the patent claims and specification that the knives move downward during pitting, the Court is not persuaded that this passage defines when the pitting operation starts or ends. The Court is persuaded by the Plaintiff's argument that the graph illustrates the knife tip moving "very rapidly downward" and "very rapidly upward;" thus, the time period during which the knife tip moves downward and upward is extremely compressed, and the vertical line illustrating t1 and t2 is not sufficiently precise to define the exact duration of the "pitting operation," or, as the Defendants argue, to expand the meaning of the terms "pitting" and "pitting operation," to include the post-pitting act of expelling the pit from the holder of a pitting apparatus.

Defendants' argument that some pits might remain clinging to the outside of the fruit and that they would therefore not be fully "pitted" until the pits have been fully expelled from the holders ignores that there is another part of the invention, claimed in unasserted Claim 1, which is called "the wiper assembly" and it removes any pits that remain clinging to the apparatus after pitting. The purpose of the "wiping blade assembly" is to "wipe any clinging pits from each passing holder …following the operations of pitting and post-pitting disengagement of the pitting knives from the holders." *Id.* 11:59-65. Plaintiff correctly points out that Defendants' proposed construction attempts to import distinct functions performed by a separate structure recited in unasserted Claim 1.

The Court is also not convinced that Plaintiff's construction of "pitting operation" would render the claims indefinite. Citing 35 U.S.C. § 112, second paragraph, Defendants argue that a claim that mixes both apparatus and the method steps of using the apparatus is indefinite. *Rembrandt Data Technologies, LP v. AOL, LLC,* 641 F.3d 1331, 1339 (Fed. Cir. 2011) ("'[R]eciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112,

1   paragraph 2.'" (quoting *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir.

2   2005) (internal citation omitted)).  Defendants further argue that Plaintiff's construction of these

3   terms violates the written description requirement because there is no way that a skilled artisan could

4   know the instant when the pit is outside of the fruit because there is no sensing means described in

5   the specification.  A sensing means would alert the user as to when the pitting operation has

6   concluded; thus Plaintiff's construction requires a "non-existent sensor" and therefore has no

7   support in the written description and the patent is invalid.  Defs.' Br. at 9.

8         The Court is not persuaded by these arguments.  As Plaintiff correctly points out, for a claim

9   to qualify as an improper mixed apparatus and method claim, it must include both an apparatus and

10  steps for using the apparatus.  *See IPXL Holdings LLC. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384

11  (Fed. Cir. 2005) (holding that a claim reciting a system element, which included "an input means,"

12  and a step using the recited input means, wherein "the user uses the input means to either change the

13  predicted transaction information or accept the displayed transaction type and transaction

14  parameters" was an improper mixed apparatus and method claim).  *See also Rembrandt Data*

15  *Technologies*, 641 F.3d at 1339 (finding that a claim including apparatus elements of a "buffer

16  means, fractional encoding means, second buffer means, and trellis encoding means" was an

17  improper mixed apparatus and method claim because it also included the step of "transmitting the

18  trellis encoded frames.").  Further, the Court agrees with the Plaintiff that a functional limitation,

19  *i.e.*, defining something by what it does rather than by what it is, is a "permissible means of

20  articulating a claim limitation."  *See Ricoh Co. v. Katun Corp.*, 486 F. Supp. 2d 395, 402 (D. Del.

21  2007); *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1998) ("A patent applicant is free to recite

22  features of an apparatus either structurally or functionally.").  Courts consistently find that claims

23  containing "both a physical description of an apparatus and a description of the apparatus' function,

24  *e.g.*, 'communicates,' 'populates,' 'configured to,' 'and upon activation' were not impermissible

25  apparatus-method claims.  Instead, these 'claims simply use active language to describe the

26  capability of the apparatuses; they do not claim the activity itself.'"  *Ricoh Co.*, 486 F. Supp. 2d at

27  402 (collecting cases); *see also, Yodlee, Inc. v. CashEdge, Inc.*, No. 05–01550, 2006 WL 3456610,

28  at *3–5 (N. D. Cal. Nov. 29, 2006) (Illston, J.).  In *Yodlee*, Judge Illston provided the following

    example of a permissible functional limitation that could be included in a claim alongside a

description of the apparatus: "A simple analogy would be a claim which physically describes a pair of scissors designed to cut paper, then states, 'upon opening and closing the sharp edges of the scissors on a piece of paper, the paper is cut.' The language describes the capability of scissors; it is function language.  Infringement occurs upon the manufacturing and sale of scissors that are capable of cutting paper."  2006 WL 3456610, at *5.

Regardless of when the "pitting operation" is defined as ending, this claim describes what the apparatus is configured to do.  *See Ricoh Co*., 486 F. Supp. 2d at 402 (claims may properly define how apparatus is configured).  The Court agrees with Plaintiff that neither construction describes a step in using the apparatus; thus, the claim does not improperly describe both an apparatus and a step in using that apparatus.

The Court concludes, however, that there must be some temporal limitation on this term in order to assist the jury.  Accordingly, the Court construes the term "pitting operation" to mean "the process of removing a pit from a fruit and which continues until the pit is removed from the fruit."[3]

//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[3]The Court declines to address the written description requirement at this stage of the case.  The issue may be raised on summary judgment.

United States District Court

For the Northern District of California

**3.** **"During the Pitting Operation" and "After the Pitting Operation**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **During the Pitting Operation**<br><br>(Claims 5, 12) | The plain and ordinary meaning of "during" used along with the term "pitting operation" discussed *supra*. | the time period while 'the downward (pitting) stroke of each knife' is occurring.  To the extent that the pitting operation is construed to end before the knives reach their "lowest position" and before the end of the downward (pitting) stroke of each knife, then the claim term "during the pitting operation"is indefinite. |
| **After the Pitting Operation**<br>(Claims 5, 12) | The plain and ordinary meaning of "after" used along with the term "pitting operation" discussed *supra*.<br><br>OR<br><br>Any moment in time following the end of the process of pitting fruit. | The time period of the "upward (retracting) stroke which follows the pitting stroke."<br><br>To the extent that the pitting operation is construed to end before the knives reach their lowest position and before the end of the downward (pitting) stroke of each knife, and before the commencement of the upward (retracting) stroke which follows the pitting stroke, then the claim term "after the pitting operation" is indefinite. |

Although the parties agree that the term "pitting operation" needs to be construed, they disagree as to whether "during" and "after" the pitting operation requires construction.

The Court finds that the terms "during the pitting operation" and "after the pitting operation" should be construed in reference to the Court's construction of  "pitting operation."  "During" and "after" are commonly understood terms that do not have special meaning within the context of the '949 Patent.  Thus, "during the pitting operation" should be construed to mean "during the process of removing a pit from a fruit" and  "after the pitting operation" should be construed to mean "after the pit is removed from a fruit."

Plaintiff argues that the terms "during the pitting operation," and "after the pitting operation" require no construction, and if construed, should not be construed independently from the

14

United States District Court

For the Northern District of California

term "pitting operation."  Plaintiff also argues that the plain language of "during" and "after" the

pitting operation does not need to be explained in order to properly construe the scope of these

claims, because "during" and "after" are "common words familiar to most English speakers such

that they do not require construction."  Pl.'s Brief at 23.  Alternatively, if the Court finds it necessary

to construe these terms, Plaintiff urges the Court to construe them "in accordance with their plain

and ordinary meaning."  Pl.'s Brief at 23 (citing Brown Decl., Exh. C (Random House at p. 608 and

63 (defining during as "at some time or point in the course of," and "after" as "later in time than, in

succession to") and Encarta (defining during as "at some point or moment within a particular period

of event" and after as "later in time than")).

The Court agrees.  Defendants' constructions of these terms introduce terms that do not

appear in the claim language or even in the Defendants' constructions of the term "pitting operation"

– "downward (pitting) stroke," and an "upward (retracting) stroke."  Further, Defendants'

construction would add extraneous elements to the claim and obscure their meaning.  As discussed

further above, the Court rejects Defendants' constructions to the extent that they depend upon

defining the pitting operation in reference to when the knives have reached the end of the downward

stroke because the Court has rejected the Defendants' argument that the pitting operation includes

the point in time when the knives are at their lowest position.

Finally, the Court rejects Defendants' assertion that the Plaintiff's proposed construction of

the "during" and "after" pitting would render the claim indefinite.  A claim is indefinite only if it is

"not amenable to construction" or "insolubly ambiguous."  *See Datamize LLC*, 417 F.3d at 1347.

Merely adding the temporal limitations of "before" and "after" the pitting operation does not render

the term indefinite.

Accordingly, the Court construes the terms  "during the pitting operation" to mean "during

the process of removing a pit from a fruit" and  "after the pitting operation" to mean "after the pit is

removed from a fruit."

//

//

//

4.      "Active assembly

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "Active assembly" <br><br> (Claims 5, 12) | The plain and ordinary meaning, namely, "a combination of components carrying out physical movement or an action" | "'Active assembly' has no antecedent basis, has no ordinary and customary meaning, and thus is indefinite." <br><br> "To the extent that the Court does rule that the claim term is not indefinite, Defendants' preliminary construction of this term is defined as 'an actively driven assembly of elements which are mounted to the frame and positioned to, in response to control signals and as the holders pass by, move relative to the holders in order to transition the pockets from an open configuration to a closed configuration (claim 5) and to vary a gripping force exerted upon the fruit by the pockets (claim 12).'" |

The Court finds that neither party's proposed construction is appropriate. Plaintiff's proposed construction is too vague and adds nothing to the definition of "active assembly." Defendants' definition, on the other hand, repeats claim language, rendering other language of the claim superfluous or redundant. Defendants' construction also imports numerous limitations from the specification. Alternatively, Defendants' argue that it is indefinite. However, treating the relevant limitations as means-plus-function limitations under 35 U.S.C. § 112, ¶ 6 allows them to be construed. This is significant because claim constructions that invalidate patents are disfavored – if the scope of claims is ambiguous, they should, if possible, be construed to preserve their validity. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 914 (Fed. Cir. 2004). The Court notes that a finding of indefiniteness would be paradoxical in an case such as this, where there is a detailed description of the invention, including a detailed description of the way the active assembly

United States District Court

For the Northern District of California

1  functions.  As Defendants suggest, the root of this paradox may be that by defining "active

2  assembly" based on function and not structure, Plaintiff has drafted a means-plus-function claim

3  under 35 U.S.C. § 112  6.  *See* Defendants' Responsive Claim Construction Brief ("Defendants'

4  Brief"), Docket No. 56, at 16 n.7. The Court is persuaded that the relevant limitations may be

5  construed as means-plus-function limitations.  The Court will address the parties' arguments with

6  respect to indefiniteness followed by a means-plus-function analysis.

**a.       Indefiniteness**

8         A patent must "conclude with one or more claims particularly pointing out and distinctly

9  claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112 ¶ 2.  "If

10 the meaning of the claim is discernible, even though the [claim construction] task may be formidable

11 and the conclusion may be one over which reasonable persons will disagree . . . the claim []is

12 sufficiently clear to avoid invalidity on indefiniteness grounds.  *Exxon Research & Eng'g Co.*, 265

13 F.3d at 1375.  Only those claims that are "not amenable to construction," or that are "insolubly

14 ambiguous," are indefinite.  *Datamize LLC*, 417 F.3d at 1347.  *See also Exxon Research & Eng'g

15 Co.*, 265 F.3d at 1375 (a claim need not be plain on its face in order to avoid condemnation for

16 indefiniteness, but must be amenable to construction).

17        Here, the parties are in agreement that the term "active assembly" has no commonly

18 understood meaning in the relevant art.  Thus, expert opinion will not assist the Court.  The parties

19 further agree that because the patent specification does not use the term "active assembly," this

20 claim term appears to be a reference to the "actively driven actuator assembly" that is discussed in

21 the specification at Column 18, lines 53 and 54 and depicted in Figure 24.

22        Plaintiff argues that *anything* that performs the functions set forth in the patent fall within the

23 scope of the term "active assembly."  Plaintiff's construction – from the dictionary – is just as

24 ambiguous as the term "active assembly" itself.  Further, the terms "combination" or "components"

25 appear nowhere in the claims nor do they appear in the patent specification.  Thus, one of ordinary

26 skill in the art would not be able to ascertain what "a combination of components carrying out

27 physical movement or an action" means.  Importantly, as Plaintiff conceded at the hearing,

28 Plaintiff's proposed construction leads to the incorrect result that anything that is configured to

United States District Court

For the Northern District of California

1    cause pockets to be in a closed configuration during pitting will be an "active assembly."  One of

2    ordinary skill in the art would not be able to ascertain the bounds of the claims.

3         In support of its construction, Plaintiff cites to the specification, which explain at length what

4    the "active assembly" is and what it does in the context of the claimed invention.  For example, the

5    Summary of the Invention explains that

6         The active separating assembly preferably includes cam tracks which are actively (*e.g.*,
          pneumatically, or by solenoid) driven by a cam track actuator to vary the force with which
7         the holders grip the fruit during and after pitting. For example, the active cam track drive
          assembly can cause the holders to open and close at appropriate times, including by opening
8         briefly just after pitting while the pitting knives completely or partially retract from the pitted
          fruit).

9

10   '949 Patent at 9:45-53.  The specification describes multiple embodiments of the active separating

11   assembly in detail:

12        To improve the efficiency with which this class of embodiments separates the pitted fruit
          flesh (and pits) from the holders after pitting in accordance with the invention, each
13        embodiment includes an actively (*e.g.*, pneumatically, or by solenoid) driven actuator
          assembly 88 (as shown in FIGS. 24 and 25) is used to move (at appropriate times during the
14        pitting cycle) a pair of cam tracks 87 to vary the force with which each fruit holder 36 grips
          fruit during and after pitting.  Some embodiments in this class are identical to the
15        conventional apparatus of FIGS. 1-9, modified to replace the continuous fruit holder
          conveyor drive with an intermittent drive, and further modified to replace notched cam tracks
16        85 and 85A with actuator assembly 88 and non-notched cam tracks 87 (as shown in FIGS. 24
          and 25). Other embodiments in this class are identical to the apparatus of FIGS. 10-14,
17        modified to replace the continuous fruit holder conveyor drive with an intermittent drive, and
          further modified to replace notched cam tracks 85 and 85A with actuator assembly 88 and
18        non-notched cam tracks 87 (as shown in FIGS. 24 and 25). Still other embodiments in this
          class are identical to the apparatus of FIGS. 10-14, with the knife drive assembly replaced by
19        the box cam knife drive assembly of FIGS. 17-22, and with the continuous fruit holder
          conveyor drive replaced by an intermittent drive, and with notched cam tracks 85 and 85A
20        replaced by actuator assembly 88 and non-notched cam tracks 87 (as shown in FIGS. 24 and
          25).

21

22   '949 Patent at 18:50-19:9.  *See also* 19:43-20:23 (describing detailed operations of the "actively

23   driven actuator assembly").

24        Plaintiff recites these passages from the specification in support of its argument that each of

25   these embodiments comprises "a combination of components carrying out physical movement or an

26   action" that correspond to the "active assembly" recited in claims 5 and 12, thereby supporting

27   interpreting the "active assembly" in accordance with its ordinary meaning as a combination of

28   components carrying out physical movement or an action.  Pl's Brief at 14 (citing Brown Decl. Exh.

     C (Random House at p. 20 (defining active as "involving physical effort and action") and p. 125

(defining assembly as "a group of machine parts, esp. one forming a self-contained, independently mounted unit")).  The Plaintiff's construction vaguely describes the "active assembly" in terms of where it is located (*i.e.*, "positioned"), and how it functions (*i.e.*, is "configured to cause") in the context of those claims.

Defendants correctly point out that the active assembly is configured and functions slightly differently in Claims 5 and 12.  In Claim 5, the active assembly is "configured to cause the pockets of each of the holders to be in the closed configuration during the pitting operation and to move the pockets of said each of the holders from the closed configuration to the open configuration after the pitting operation," whereas in Claim 12 the active assembly is "configured to move relative to the holders so as to vary the gripping force exerted by the pockets on specimens of fruit held in said holders during and after the pitting operation."  Each of these phrases in Claims 5 and 12 modifies the term "active assembly."  Citing their expert, Defendants argue that not only does the term "active assembly" have no antecedent basis, it has no ordinary and customary meaning to a skilled artisan.  Declaration of Richard Klopp in Support of Defendants' Claim Construction Brief ("Klopp Decl."), at ¶¶18-25.  Defendants' expert states that in the field of mechanics, Plaintiff's proposed construction "could mean anything from a yoyo to a space shuttle."  *Id.* at ¶¶23-25.  Defendants argue that this term is insolubly ambiguous and must construed as indefinite.  Although a close question, the Court concludes that the claim is not indefinite, as it can be properly construed as a means-plus-function claim under 112, ¶ 6.

### b.     Means-Plus-Function Limitation

### I.     Legal Standard

Title 35, section 112, paragraph 6 of the United States Code provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (2011).

Section 112, ¶ 6 acts to allow claims which might otherwise be found indefinite.  *See Laitram*, 939 F.2d at 1536; *Jonsson v. Stanley Works*, 903 F.2d 812, 819 (Fed. Cir. 1990); *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201 (Fed. Cir. 1987) ("Congress has provided

this statute as a specific instruction on interpretation of this type of claim which otherwise might be held to be indefinite").  However, a means-plus-function claim may still be found indefinite if the specification fails to disclose adequate structure corresponding to the claimed function.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

Under section 112, ¶ 6, it is proper to import structural limitations from the specification.  If a claim recites a means for performing a specific function, without specific structure for performing that function, the patent claim must be construed to cover the structure disclosed in the specification. *Data Line*, 813 F.2d at 1201 (citing *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 848 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 831 (1985)).  However, in doing so, a court may only import so much structure as is necessary to perform the function, and may not import additional functional limitations not in the claim itself.  *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

A claim construed under section 112, ¶ 6 rather than being found indefinite, will necessarily be limited in scope.  "An element of a claim described as a means for performing a function, if read literally, would encompass *any* means for performing the function.  But section 112 ¶ 6 operates to cut back on the types of means which could literally satisfy the claim language." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989) (internal citation omitted) (emphasis in original).

A patent applicant may use such a "means-plus-function" limitation to claim an element of a combination functionally, without reciting structures for performing those functions.  *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000).  The presence or absence of the terms "means" is central to the analysis.  *Personalized Media Communications v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998).  A claim limitation that uses the word "means" invokes a rebuttable presumption that section 112, ¶ 6 applies, while a limitation that does not use "means" triggers the rebuttable presumption that section 112, ¶ 6 does not apply.  *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-72 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).

"[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed.

United States District Court

For the Northern District of California

Cir. 2006); *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). However, the presumption that section 112, ¶ 6 does not apply absent the word "means" may be rebutted, when it is clear that the claim element invokes purely functional terms, but does not recite sufficient structure (or sufficiently definite structure) to perform that function. *Massachusetts Institute of Technology v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006) (hereinafter "*MIT*"); *CCS Fitness, Inc.*, 288 F.3d at 1369; *Kemco Sales, Inc. v. Control Papers Company, Inc.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000); *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999) ("This presumption can collapse when a limitation lacking the term 'means' nonetheless relies on functional terms rather than structure or material to describe performance of the claimed function.").

ii.     **Application of Section 112 ¶ 6 to Claims 5 and 12 of the '949 Patent**

Mindful of the strength of the presumption against construing a means-plus-function limitation in the absence of the word "means," the first question is whether "active assembly" connotes sufficiently definite structure, and then whether the remainder of the limitation is functional or structural in nature.

In construing claims, a court should first look to  intrinsic evidence: the language of the claims, the specification, and the prosecution history.  *Vitronics,* 90 F.3d at 1583; *accord Philips,* 415 F.3d at 1314.  In determining whether a claim limitation should be construed as a means-plus-function limitations, a court must consider the perspective of one of ordinary skill in the art, which may require extrinsic evidence such as dictionaries and expert testimony.  *Apex*, 325 F.3d at 1372-74.  If the limitation suggests sufficiently definite structure to one of ordinary skill in the art, section 112, ¶ 6 should not apply.  *Id.*

First, with respect to the term "assembly," dictionary definitions advanced by Plaintiff in support of its construction show that an "assembly" is a set of parts or components, that might not even be put together into a unit or finished product.[4]  It is also instructive to explore how the term

---

[4] *See* Brown Decl., Exhs. B and C, Docket No. 53, citing ENCARTA WORLD ENGLISH DICTIONARY 100 (St. Martin's Press 1999) (Assembly: 1. FITTING COMPONENTS TOGETHER the putting together of parts to make a finished product; 5. COMPONENTS a set of components before they are put together to make a finished product) and WEBSTER'S UNABRIDGED DICTIONARY 125 (Random House, 2d Ed. 1998) (Assembly: 6. Mach. A group of machine parts, esp. one forming

United States District Court

For the Northern District of California

1   "assembly" is used in the patent-in-suit.  The term "assembly" appears in twenty-eight distinct

2   phrases in the specification or claims of the patent.[5]  In most of these, "assembly" is modified by

3   nouns or verbs denoting some degree of structure.  One needs no skill in the mechanical arts to

4   comprehend that a "rocker arm assembly" includes or contains a rocker arm, a "wiper assembly"

5   includes or contains a wiper, or that a "knife driving assembly" drives the knives, a "holder drive

6   assembly" drives the holders, and so forth.  In fact, the only phrase where "assembly" is not

7   modified by qualifiers clearly denoting or referencing structure is the disputed phrase "active

8   assembly."  By finding it necessary to qualify the term 'assembly' wherever used, the specification

9   itself suggests that "assembly" alone does not denote any specific structure.

10       Therefore, the unadorned term "assembly" has no physical or structural component.  Like

11   "mechanism," "element," or "device" it does not "connote sufficiently definite structure."  *MIT*, 462

12   F.3d at 1354.  It is "not recognized as the name of any definite structure, and is a substitute for the

13   term 'means for.'"  *Welker Bearing Co.,* 550 F.3d at 1096; *Lighting World*, 382 F.3d at 1360.  The

14   Court is satisfied that, other than imparting a certain linguistic awkwardness, one could substitute

15   the word "means" (or perhaps the word "widget") for the word "assembly" throughout the claims,

16   and not change the scope or meaning of the claims.  *See Personalized Media Communications*, 161

17   F.3d at 705 (noting that generic terms such as "means," "element" or "device," and coined terms

18   such as "widget," would invite the application of section 112, ¶ 6).

19       As "assembly" does not connote definite structure, the next inquiry is whether the modifier

20   "active" imparts sufficiently definite structure from the perspective of one skilled in the art.  *See*

21   *Greenberg v. Ethicon Edo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996) (holding that § 112 ¶ 6 did

22   not apply to the term "detent mechanism," because the noun "detent" denoted a device with a

23   generally understood meaning in the mechanical arts), *cf. MIT*, 462 F.3d at 1354 (finding that

24

25   _____

  a self-contained, independently mounted unit).

26       [5]In particular: box cam assembly, active separating assembly, separating assembly, knife driving

27   assembly, drive assembly for rotating the box cam, pulley and sprocket assembly, sprocket assembly,

  cam assembly, shaker bar assembly, pitting knife assembly, knife assembly, rotating brush assembly,

28   drive assembly, conveyor assembly, active cam track drive assembly, pitting knife drive assembly, wiper

  assembly, actively (*e.g.*, pneumatically, or by solenoid) driven actuator assembly, knife drive assembly,

  pit wiper assembly, rocker arm assembly, rocker assembly, actuator assembly, holder drive assembly,

  pitting location assembly, wiping blade assembly, mounting assembly, box cam rotating assembly,

  active assembly.  '949 Patent, *passim*.

United States District Court

For the Northern District of California

limitation of "colorant selection mechanism" was subject to § 112, ¶ 6, because it was undefined in the specification and devoid of general meaning in the art).  *See also Welker Bearing*, 550 F.3d at 1094 (discussing the role of "adjectival modifiers" in means-plus-function limitations).  Again, Plaintiff has advanced dictionary definitions in support of its construction, which show that "active" means carrying out physical movement or action, but this adds more functional context and not structure.[6]  Further, Plaintiff's resulting construction of  "active assembly" – "a combination of components carrying out physical movement or an action"–  refers equally to any combination of parts or components carrying out any action.  *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1214 (Fed. Cir. 1998) (refusing to construe a claim "so broadly to cover every conceivable way or means to perform the function").

In fact, as discussed previously, the parties both agree that "active assembly" has no ordinary and customary meaning to one skilled in the relevant art.  "[T]he phrase 'active assembly' is not a widely used or known term in the field of mechanical engineering and is indefinite from the standpoint of someone having ordinary skill in the art (and science) of mechanical engineering."  Klopp Decl., Docket No. 58 at ¶22.  "I agree that the term 'active assembly' is not a widely used term having a specific meaning in the field of mechanical engineering."  Declaration of Jeff S. Davis ("Davis Decl.") in Support of Vistan Corporation's Reply in Support of its Claim Construction Brief, Docket No. 60 at ¶19.  Therefore, a person of ordinary skill would have "no recourse but to turn to the patent's specification to derive a structural connotation."  *Welker Bearing*, 550 F.3d at 1096.

Because "active assembly" does not connote sufficiently definite structure, the last step before applying section 112, ¶ 6 is determining that the remaining elements of the claim limitation are functional and not structural.  The limitations where the disputed term "active assembly" appears can be further decomposed:

---

[6]*See* Brown Decl., Exhs. B and C, citing ENCARTA WORLD ENGLISH DICTIONARY 16 (Active: 1. MOVING ABOUT moving about, working, or doing something as opposed to resting or sleeping; 3. DOING SOMETHING carrying out some action or process, or able to do so); WEBSTER'S UNABRIDGED DICTIONARY 20 (Active: 1. engaged in action; characterized by energetic work, participation, etc.; 3. involving physical effort and action; 6. causing activity or change, capable of exerting influence).

| Claim 5 | Claim 12 |
|---|---|
| an active assembly | an active assembly |
| positioned to engage the holders as the holders pass the pitting knife assembly, | positioned to engage the holders as the holders pass the pitting knife assembly, |
| and configured to cause the pockets of each of the holders to be in the closed configuration during the pitting operation and to move the pockets of said holders from the closed configuration to the open configuration after the pitting operation | and configured to move relative to the holders so as to vary the gripping force exerted by the pockets on specimens of fruit held in said holders during and after the pitting operation, |
| thereby improving efficiency of separation of pitted fruit flesh from the holders after said pitting operation. | thereby improving efficiency of separation of pitted fruit flesh from the holders after said pitting operation |

'949 patent, 21:43-51 (claim 5), 22:47-53 (claim 12).  The question is whether the last three limitations describe a function. The Court concludes that they do.

In both claims 5 and 12, the active assembly is first limited as "positioned to engage the holders as the holders pass the pitting knife assembly."  This is a limitation on the placement of the active assembly.  Position may be a physical attribute, but the position of the active assembly is described not in structural terms (*i.e.*, adjacent to, above, abutting, etc.) but rather operatively or functionally – it is positioned so as to engage the holders.  This part of the limitation teaches where the active assembly must be placed, and further elucidates how the active assembly functions (it has to engage the holders somehow) but provides no insight into what the active assembly *is*.  The active assembly is next limited as "configured to cause" the pockets of the holders to be in either the open or closed configuration at different stages of the pitting operation in claim 5, and "configured to move relative to the holders" so as to vary the gripping force at different stages of the pitting operation in claim 12.  This part of the limitation is entirely functional, rather than structural, with respect to the active assembly – it again describes what the active assembly does, not what it is.  Although the specific function is different in each claim, the active assembly is "configured" to achieve the different functions, which is simply another functional constraint – that the active assembly be "configurable."   Finally, each limitation recites that the active assembly "improves the efficiency of separation of pitted fruit flesh from the holders."  This limitation is neither functional nor structural, but rather, restates the object of the invention.

Based on the foregoing, the language of the "active assembly" limitations in claims 5 and 12 does not provide any structure. Because "the limitation is drafted as a function to be performed rather than definite structure or materials," the Court finds that the presumption has been rebutted, and the limitations are means-plus-function limitations subject to section 112, ¶ 6. *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213 (Fed. Cir. 1998).

### iii. Construction of "Active Assembly" as a Means-Plus-Function Limitation: Identifying Corresponding Structure

A means-plus-function limitation must be carefully construed to cover only corresponding structure. As the Federal Circuit has explained,

> [c]onstruction of a means-plus-function limitation follows a two-step approach. First, we must identify the claimed function, *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258, 52 USPQ2d 1258, 1263 (Fed. Cir. 1999), staying true to the claim language and the limitations expressly recited by the claims. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113, 63 USPQ2d 1725, 1730 (Fed. Cir. 2002). Once the functions performed by the claimed means are identified, we must then ascertain the corresponding structures in the written description that perform those functions. *Id.* A disclosed structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424, 43 USPQ2d 1896, 1900 (Fed. Cir. 1997). In other words, the structure must be necessary to perform the claimed function. *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352, 66 USPQ2d 1341, 1345 (Fed. Cir. 2003).

*Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003)

First, with respect to function, the function of the active assembly is to "engage the holders as they pass the pitting knife assembly" and in claim 5 "cause the pockets of each of the holders to be in the closed configuration during the pitting operation and to move the pockets of said each of the holders from the closed configuration to the open configuration after the pitting operation" and in claim 12 "move relative to the holders so as to vary the gripping force exerted by the pockets on specimens of fruit held in said holders during and after the pitting operation."

As for the corresponding structure, although "active assembly" does not literally appear in the specification (if it had, this lengthy exercise in construction might have been avoided), the word "assembly" is modified in some fashion by the qualifier "active" in several places in the written description. In the "Summary of the Invention," the invention is described as follows:

> The apparatus includes at least one of: a box cam assembly for driving the pitting knives relative to the holders to accomplish pitting; *an active separating assembly which improves the efficiency of separation of pitted fruit and pits from the holders after pitting (in embodiments in which the holders are intermittently driven so as to be stationary when the*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  *pitting knives engage the fruit);* and a fixedly mounted wiping blade positioned to wipe pits
from the holders after pitting. *The active separating assembly preferably includes cam tracks*
2  *which are actively (e.g., pneumatically, or by solenoid) driven by a cam track actuator to*
*vary the force with which the holders grip the fruit during and after pitting. For example, the*
3  *active cam track drive assembly can cause the holders to open and close at appropriate*
*times, including by opening briefly just after pitting while the pitting knives completely or*
4  *partially retract from the pitted fruit).*

5  '949 Patent at 9:37-52 (emphasis added).  Then, in describing those embodiments that include an

6  intermittent holder drive mechanism:

7  We next describe another class of embodiments in which *the pitting apparatus of the*
*invention employs an intermittent fruit holder conveyor drive mechanism* to accomplish
8  pitting of prunes, dates, or similar soft fruit. . . . *To improve the efficiency with which this*
*class of embodiments separates the pitted fruit flesh (and pits) from the holders* after pitting
9  in accordance with the invention, *each embodiment includes an actively (e.g., pneumatically,*
*or by solenoid) driven actuator assembly 88 (as shown in FIGS. 24 and 25) is used to move*
10  *(at appropriate times during the pitting cycle) a pair of cam tracks 87 to vary the force with*
*which each fruit holder 36 grips fruit during and after pitting.*

11

12  '949 Patent at 18:40-58 (emphasis added).

13       The Court concludes that the language above describes structure directed at the function of

14  the "active assembly" in claims 5 and 12.  Each section mentions improving the efficiency of

15  separating fruit flesh from the holders, a phrase which does not appear in any claims other than 5

16  and 12.  The language above is also directed at the claims (and the active assembly limitations) by

17  reference to varying the force on the fruit, and opening or closing the holders before or after pitting.

18  Because the structural information at 18:40-58 applies to the class of embodiments having an

19  intermittent holder drive mechanism, and claims 5 and 12 both include this limitation, the structure

20  recited at 18:40-58 must apply without exception to any embodiment satisfying claims 5 and 12.

21  The relevant structural language is "an actively (*e.g.*, pneumatically, or by solenoid) driven actuator

22  assembly" which moves "a pair of cam tracks."  This language therefore leads to a construction of

23  active assembly as "an assembly containing pneumatically- or solenoid-driven actuators connected

24  to a pair of cam tracks."  The omission of the term "e.g." from this construction is intentional.

25  "Pneumatically" and "solenoid" are the only types of "actuator" identified.

26       When describing preferred embodiments, the patent further elaborates on the actuators which

27  are an integral part of the active assembly:

28       In preferred embodiments, *each actuator 88 includes a pneumatic cylinder* configured to pull
or push track 87 coupled thereto (to move the track to the left or right when viewed as in
FIG. 24) in response to externally supplied (or internally generated) control signals. The
control signals can be generated (in any of a number of well known ways) by a conventional

26

United States District Court
For the Northern District of California

timing system operating in synchronism with both the cyclical motion of the holder conveyor and the cyclical motion of the pitting knife assembly, so as to be useful to cause actuators 88 to open briefly and then reclose the holder pockets at appropriate times during each pitting cycle. In other preferred embodiments, *each actuator 88 is a mechanical linear actuator* configured to pull or push track 87 coupled thereto (to move the track to the left or right in FIG. 24) in response to externally supplied (or internally generated) control signals of the described type. In still other embodiments, *each actuator 88 is an actuator* of another type configured to pull or push track 87 coupled thereto (to move the track to the left or right in FIG. 24) in response to externally supplied (or internally generated) control signals as described.

'949 Patent at 20:4-24 (emphasis added).  Preferred embodiments can incorporate a "pneumatic cylinder," or alternatively, a "mechanical linear actuator."  Claim constructions that exclude preferred embodiments are disfavored. *Primos Inc. v. Hunter's Specialties Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[W]e ... should not normally interpret a claim term to exclude a preferred embodiment."); *Vitronics,* 90 F.3d at 1583 ("Such an interpretation [excluding a preferred embodiment] is rarely, if ever correct and would require highly persuasive evidentiary support. . .").  Even so, preferred embodiments are part of the entire class of embodiments; therefore these (mechanical linear) actuators in the preferred embodiments must be "actively (*e.g.*, pneumatically, or by solenoid) driven."  But in an abundance of caution to ensure that the construction does not exclude the preferred embodiments, the construction should specifically incorporate "mechanical linear actuator" in some way.  Accordingly, the Court construes "active assembly" to be, at a minimum:

> an assembly containing pneumatically- or solenoid-driven actuators, or mechanical linear actuators, connected to a pair of cam tracks, and equivalents thereof.

In their claim construction brief, Defendants argue that "active assembly" can not be construed to include an actuator, or a specific type of actuator, so as not to violate the doctrine of claim differentiation with respect to unasserted dependent claims 7 and 13, which specifically claim actuators.  Defendants' Brief at 15.  But a limitation imported from the specification pursuant to section 112, ¶ 6 does not violate the prohibition against reading limitations from a dependent claim, even when the same limitation coincidentally appears in a dependent claim. *Nomos Corp. v. Brainlab USA, Inc*., 357 F.3d 1364, 1368 (Fed. Cir. 2004); *Laitram Corp.*, 939 F.2d at 1538 (noting that the judicially-created doctrine of claim differentiation is a guide, not a rigid rule, and in any event cannot override a statutory mandate).

1    Defendants also argue that any construction of active assembly must limit the assembly to be

2  "fixedly mounted" to the frame of the pitting apparatus, and "respond to control signals."

3  Defendants' Brief at 14-15 and n.5, n.6.  Again, it is only proper to import limitations from the

4  specification if they are "necessary" to perform the function.  *Welker Bearing*, 550 F.3d at 1097.

5  Here, the "fixedly mounted" limitation is derived from language in the specification, referencing

6  Figure 24, which describes the actuator as mounted to "side plate 112A."  Notwithstanding the

7  absence in Figure 24 of anything labeled "112A," there is nothing in the specification to suggest that

8  the particular way the actuators is mounted is *necessary* to the claimed function.

9    As to control signals, both claims 5 and 12 require that the active assembly perform functions

10  at specific times:  either "during" or "after" the pitting operation.  The control signals are generated

11  by a "timing system operating in synchronism with both the cyclical motion of the holder conveyor

12  and the cyclical motion of the pitting knife assembly, so as to be useful to cause actuators to open

13  briefly and then reclose the holder pockets *at appropriate times* during the pitting cycle."  '949

14  Patent at 20:8-15 (emphasis added).  A "timing system" is thus structure that corresponds to the

15  function of operating the actuators during and after the pitting operation.  Although the control

16  signals and the timing system that generates them are described only in the context of certain

17  embodiments, they are necessary to the functionality described in the claims:  There is nothing else

18  in the written description that discloses *how* the actuators would operate at the proper times, which is

19  a critical aspect of the claimed function.  *See Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, No.

20  2011-1173, 2012 WL 386355 (Fed. Cir. Feb. 8, 2012) (limiting a means-plus-function claim to the

21  single preferred embodiment, because it was the only corresponding structure clearly associated with

22  the claim's function).  Accordingly, the Court construes the structure of  "active assembly" as:

> "an assembly containing pneumatically- or solenoid-driven actuators, or mechanical linear actuators, connected to a pair of cam tracks, where the actuators move the cam tracks in response to control signals generated by a timing system operating in synchronism with both the cyclical motion of the holder conveyor and the cyclical motion of the pitting knife assembly."

26  //

27  //

28  //

5.      "Holders"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "holders"<br><br>(Claims 5, 12) | "A structure wherein fruit may be placed for transport through a pitting apparatus" | "an assembly of elements within a pitting apparatus which translate together around a closed loop relative to a frame thereof and which have pockets therein which hold fruit for pitting of the fruit" |

The Court finds that Defendants' proposed construction of this term is redundant and renders claim language superfluous. Plaintiff's proposed construction is correct

The Plaintiff's construction is supported by the patent. Specifically, the patent provides that the holders "having pockets dimensioned to hold soft fruit," and are coupled to a "holder drive assembly" that is configured "to translate the holders intermittently around a closed loop such that each of the holders passes the pitting knife assembly while translating intermittently around the loop." '949 Patent at 21:24; 22:29; 21:34-38; 22:38-42. The specification further explains that each holder contains pockets to hold fruit and, as discussed below, that the conveyor "translates" the holders. *Id.* at 1:59-60, 3:17-21, 12:44-46; 19:10-14.

Plaintiff argues that Defendants' construction should be rejected because it introduces additional elements to the claims and, as with its proposed construction of "active assembly" is redundant to the express claim language. The Court agrees. Neither the specification nor claims describe the "holder" as "an assembly of elements." Such a phrase would add ambiguity to the claim language. Defendants' proposed construction would also render significant portions of the claim language superfluous. *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Both of the asserted claims include "holders having pockets configured to hold soft fruit." '949 Patent 21:24; 22:29. This language would be duplicated if Defendants' proposed language requiring that the holders "have pockets therein which hold fruit for pitting of the fruit" be adopted. Plaintiff further argues that the Defendants' proposed requirement that the holders "translate together around a closed loop" is not inherently required by the term "holder" and would render superfluous language in both of the asserted claims reciting "a holder drive assembly coupled

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   to the holders and configured to translate the holders intermittently around a closed loop." '949

2   Patent 21:34-36; 22:39-41.

3       The Court finds that Defendants' proposed construction of this term is redundant and renders

4   claim language superfluous.  Plaintiff's proposed construction is correct.  The Court therefore

5   construes the term as follows:  "A structure wherein fruit may be placed for transport through a

6   pitting apparatus."

7       **6.      "Pockets"**

8
| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **pockets**<br><br>(Claims 5, 12) | "individual compartments of a holder, each of which may hold a single piece of fruit. The pockets have at least one moveable side to allow the pockets to open and close, where when 'closed' the pockets grip a piece of fruit contained therein" | "recesses within a holder of a pitting apparatus which include pitting cups or rubbers and which hold fruit to be pitted therein and which can transition from an open configuration to a closed configuration." |

16      The Court finds that a modified version of the Plaintiff's construction is correct.

17      Plaintiff correctly points out that Claim 5 states that the holders have "pockets dimensioned

18   to hold soft fruit" that the pockets are "configured to be movable between open configuration and a

19   closed configuration;" and that the active assembly is configured to cause the pockets "to be in the

20   closed configuration during the pitting operation and to move the pockets . . . from the closed

21   configuration to the open configuration after the pitting operation."  '949 Patent 21:24-27 and 42-48.

22   Claim 12 states that the pockets are configured "to exert variable gripping force on a specimen of

23   fruit held thereby" and that the active assembly is "configured to move relative to the holders so as

24   to vary the gripping force exerted by the pockets on specimens of fruit held in said holders."  *Id.*

25   22:31-32 and 48-52.  Plaintiff argues that according to the specification, each pocket is dimensioned

26   to hold firmly one of the prunes or other articles of fruit to be pitted when the pocket is in a closed

27   configuration, that the pockets may be "closed to grip tightly the fruit being pitted," and be

28   controlled to "open when desired (so as not to grip the fruit therewithin) and to close when desired

    (to grip the fruit therewithin)."  *Id.* 1:61-62, 6:13-14;19:11-14.  Plaintiff argues that each part of its

    proposed construction 1) that the pockets are individual compartments of a holder, 2) that the

United States District Court

For the Northern District of California

pockets may hold a single piece of fruit, 3) that the pockets have at least one moveable side to allow them to open and close, and 4) that the "closed" pocket grips the fruit are directly supported by the claim language and the explanation from the specification of how the pockets work to grip the piece of fruit.

With respect to Defendants' proposed construction, Plaintiff contends that seek to import additional limitations from the specification, here, the additional element of a "pitting cup or rubber."

Defendants respond that the term "pockets" in Claims 5 and 12 should be construed to mean "recesses within a holder of a pitting apparatus which include pitting cups or rubbers and which hold fruit to be pitted therein and which can transition from an open configuration to a closed configuration." Defendants point to the fact that the specification recites "adjustable pockets." '949 Patent 1:59-63; 12:44-46. Each pocket is "dimensioned to hold firmly one of the prunes or other articles to be pitted when the pocket is in a closed configuration." *Id.* 1:59-63. Also, each pocket may be moved into the "closed configuration." *Id.* 12:58-65. That is, the pockets may be transitioned from an open configuration to a closed configuration. *Id.* 19:10-13 ("in each embodiment, the fruit holders have controllable pockets which can be controlled (by action of the pitting head cam tracks on each holder) to open when desired (so as not to grip the fruit therewithin) and to close when desired (to grip the fruit therewithin.")). *See also* '949 Patent 21:24-27; 22:29-32).

Defendants argue that the term "pocket" is unclear and thus "has to be defined in relation to *something*." *Id.* Defendants point out first that the specification defines the pockets in relation to the holders. *See* 1:59-63 ("each fruit holder includes four pocket members 58 and four pocket members 60, which define four adjustable pockets…")); (*see also*, 19:10-14 ("in each embodiment, the fruit holders have controllable pockets…")); (*see also* 3:19-21 ("…so that a prune (or other article is loaded into each of at least some of the pockets defined by the holders…")). Defendants contend that the specification also defines the pockets in relation to the "pitting cups or rubbers" and that the pitting rubbers define the bottom of the pocket. Without the pitting rubbers, the pocket would simply be a "pass through hole." *Id.* The specification states, "[e]ach holder 36 has a lower plate 46 in which a pitting cup 70 is mounted at the location of each pocket…" *See* 3:4-15. The specification

1    shows that the pitting cups are sometimes referred to as the "pitting rubbers since they are typically

2    made of rubber." *Id.*

3         Defendants next argue that the pitting cups (or rubbers) must be made of rubber because they

4    are integral to the function of the pockets.  Figures 5, 6, 10A, and 16 all confirm that the knife tip is

5    larger in diameter than the pit ejection opening in the cup or pitting rubber. Collier Decl. at ¶5, Exhs.

6    C2, C3, C4, C5.  Thus, in order for the knife to travel along the pitting path to its lowest position (as

7    Defendants contend is required by the claims as discussed above), the bottom portion of the pocket

8    must be formed of a flexible pitting rubber.  This allows the knife to complete the pitting operation,

9    and at the same time allows the fruit to be retained (by the cup or pitting rubber) within the pocket.

10   *Id.*  Further, Defendants point out that this configuration (where the bottoms of the pockets are

11   formed by pitting rubbers) is shown in each of the disclosed embodiments and all prior art cited in

12   the '949 Patent. *See, e.g. id.*

13        Finally, Defendants argue that "Plaintiff's contention that Defendants' construction of

14   'pockets' imports limitations from the specification is belied by its own construction which requires

15   the pockets 'to have at least one moveable side.'" Defs.' Brief at 21-22.  Defendants argue that

16   "Plaintiff's [construction] is the real example of the prohibited incorporation of a limitation into the

17   claims from the specification" because "[n]either the specification nor the claims reference 'at least

18   one moveable side,' but rather an assemblage of springs, rods, and members which allow the pockets

19   to move from the open configuration to the closed configuration." *Id*. at 22 (citing 1:53-2:8).

20        The Court concludes that the Defendants' construction would result in an impermissible

21   importation of limitations from the specification, specifically, the inclusion of the "pitting cup or

22   rubber."  The specification certainly describes embodiments containing this structure, but the claims

23   do not require it.  Further, nowhere in the patent is the requirement that the pitting rubbers actually

24   be made out of rubber, as opposed to some other flexible material.  The Plaintiff's construction

25   suffers the same defect, however.  Plaintiff includes "at least one movable side to allow them to open

26   and close" which is not supported by the claims or by the specification.

27        Accordingly, the Court construes the term "pockets" as "individual compartments within a

28   holder, each of which may hold a single piece of fruit."

### 7.    "Open configuration"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **"open configuration"**<br><br>(Claim 5) | A state of a pocket wherein the pocket offers little or no restrictions or resistance to fruit entering or leaving the pocket.  This is the default state of a pocket. | A configuration of pockets of the holders where the pockets have been increased in size to allow fruit to pass into and out of the pockets. |

The Court is not persuaded by either of the parties' definitions.  The Court therefore construes the term "open configuration" as "the state of the pockets that allows fruit to enter into and out of the pockets."

The pockets are configured so that they can open and close, and the pockets exert force on a piece of fruit when they are in a "closed" configuration.   Plaintiff contends that "open" configuration is the "default" state of the pocket.  *Id.* (citing1:63-2:1 and 12:49-57) (stating that the springs mounted between the main body of the holder 36 and the carrier 54 (or 56) serve to "spring-load the pockets into their open configuration"); 6:19-22 (the holder's springs briefly "relax" and then are recompressed thereby briefly opening the pockets); 7:4-7 ("More generally, as each pair of adjacent holders 36 translates along their looped path, the pockets of both holders are simultaneously closed (to perform the pitting operation," which indicates that the pockets were in an open state until closed in preparation for the pitting step). *See also* 19:30-42 (stating that the pockets are in an open configuration as they enter the pitting head housing prior to pitting).

Plaintiff disputes Defendants' proposed construction that the "open configuration" is where the pockets "have been increased in size" because it incorrectly suggests that the default state of the pockets is to be in a closed configuration.  Pl.'s Brief at 20.  The Court agrees with Plaintiff that this proposed construction is inconsistent with the descriptions in the specification, which explain that an action is applied to the structure, which allows the pockets to close.

Defendants acknowledge that the parties' competing constructions "are substantially similar."  Defs.' Brief at 19.  The key difference between the parties' constructions is the Plaintiff's addition of the phrase "[t]his is the default state of the pocket."  *Id.*  Defendants dispute Plaintiff's reliance on portions of the citation that recite springs mounted between the main body of the holder

1   and the carrier, and on claim limitations set forth in claim 8.  *Id.*  Defendants argue that neither of

2   these citations to the patent support the conclusion that the open configuration is the "default

3   position."  *Id*  First, with respect to dependent claim 8, Defendants argue that Plaintiff's argument

4   violates the doctrine of claim differentiation.  Defendants contend that Plaintiff's construction results

5   in limitations stated in dependent claims being read into the independent claim from which it

6   depends.  *Id.* (citing *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995)).  In

7   the present case, Defendants point out that Claim 8 depends from Claim 7, which depends from

8   Claim 5.  Claim 8 recites the apparatus of Claim 7 and attributes an open bias to the pockets.

9   Plaintiff "seizes on this dependent limitation and tries to import it into Claim 5."  Defs.' Brief at 19.

10  Defendants argue that Plaintiff therefore erroneously imports limitations from Claim 8 – the "bias" –

11  to the independent Claim 5, thereby violating the doctrine of claim differentiation.  *Id.* at 20.

12         In its Reply, Plaintiff argues that the doctrine of claim differentiation is "not a hard and fast

13  rule" but rather, it merely creates a presumption that each claim in a patent is different in scope and

14  "applies with the most force where the only meaningful difference between an independent claim is

15  the specific limitation at issue."  Pl.'s Reply at 14-15 (citing *SunRace Roots Ener. Co.*, 336 F.3d at

16  1303; *Ecolab Inc. v. Parclips, Inc.*, 285 F.3d at 1375).  Plaintiff attempts to clarify that it does not

17  seek to add the language regarding the "default position" in order to be consistent with dependent

18  Claim 8, but rather, to be consistent with the specification.  Pl.'s Reply at 15 (citing '949 Patent at

19  1:64-2:1).  In any event, Plaintiff points out that its proposed construction does not require Claim 5

20  to have the same scope as Claim 8 because Claim 8 has two additional limitations "which would

21  weaken the presumption under this doctrine."  *Id.*  On the other hand, Defendants' proposed

22  construction would actually contradict Claim 8 because it implies that some action must be applied

23  in order to achieve the open configuration.  *Id.*

24         The Court rejects the portion of the Plaintiff's proposed definition that adds unnecessary

25  language: "[t]his is the default state of a pocket."  This additional language adds nothing to the claim

26  and violates principles of claim differentiation.  Plaintiff is correct that the doctrine is not absolute;

27  however, it is clear in this case that adding a limitation from Claim 8 regarding the "bias" or default

28  state of the pockets would result in the importation of a limitation from dependent Claim 8 to

United States District Court
For the Northern District of California

1   independent Claim 5.  Where a limitation is contained elsewhere in a claim, it is generally

2   inappropriate to read that limitation into a claim term.  *See Phillips*, 415 F.3d at 1314.

3       Accordingly, the Court construes the term "open configuration" to mean "the state of the

4   pockets that allows fruit to enter into and out of the pockets."

5       **8.    "Vary the Gripping Force"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Vary the Gripping Force<br><br>(Claim 12) | "The plain and ordinary meaning:<br><br>Changing the pressure exerted upon an object." | movement of the active assembly relative to the holders to change the force exerted by the pockets upon a fruit |

11      The Court finds that Plaintiff's proposed construction of  this term is appropriate.  The Court

12  is not persuaded by the Defendants' proposal.

13      Plaintiff asserts that the claim language and the specification establish that the "active

14  assembly" is used to change the configuration of the pockets to grip the fruit with more or less force.

15  Thus, "vary the gripping force" refers to the change in force on the fruit within the pockets caused

16  by the active assembly and means "changing the pressure exerted upon an object, such as a piece of

17  fruit in a pocket, where the pressure holds or binds (grips) the object or piece of fruit."  The Court

18  agrees.

19      As support for its proposed construction, Plaintiff points to the fact that Claim 12 states that

20  the active assembly is "positioned to engage the holders as the holders pass the pitting knife

21  assembly," that the pockets within the holders are "configured to exert variable gripping force on a

22  specimen of fruit," and the that active assembly is "configured to move relative to the holders so as

23  to *vary the gripping force* exerted by the pockets on the specimens of fruit held in said holders

24  during and after the pitting operation . . . ."  Pl.'s Brief at 21 (citing '949 Patent 22:47-53 (emphasis

25  added)).  The specification explains how the active assembly and the cam tracks are used to "vary

26  the force with which each fruit holder 36 grips fruit during and after pitting," *id.* 18:52-58, and that

27  the "the fruit holders have controllable pockets which can be controlled (by action of pitting head

28  cam tracks on each holder) to open when desired (so as not to grip the fruit therewithin) and to close

    when desired (to grip the fruit therewithin)."  *Id.* 19:10-14.  The specification also sets forth a

United States District Court

For the Northern District of California

1  detailed description of how one of the embodiments achieves the open and closed configurations.

2  *Id.* 19:31-20:3 (discussing mechanical actions used to achieve transition of pockets to and from the

3  open configuration).

4       Plaintiff disputes Defendants' proposed construction because it does not provide any

5  meaning for the term "vary the gripping force," but instead "purports to describe how the change in

6  the gripping force is achieved." Pl.'s Brief at 21.  Because Claim 12 already specifies that the active

7  assembly is "configured to move relative to the holders so as to vary the gripping force exerted by

8  the pockets on the specimens of fruit held in said holders during and after the pitting operation"

9  (22:47-52), Plaintiff argues that Defendants' construction merely repeats the claim language

10  describing the movement and configuration of the active assembly.  *Id.* (citing *Agilent Techs., Inc.,*

11  *supra*, 567 F.3d at 1378 ("A claim construction that gives meaning to all the terms of the claim is

12  preferred over one that does not do so.").

13       Defendants point out that the parties are in agreement that the variation in gripping force

14  recited in Claim 12 must be caused by the "active assembly." Defs.' Brief at 18 (citing Pl.'s Opening

15  Brief at 21:19).  Defendants argue that their construction "tracks" the language of Claim 12,

16  including the references to "active assembly," "holders," "pockets" and "fruit" and that it is

17  supported by language in the Abstract: "actively driven cam tracks within the knife driving assembly

18  which vary the force with which the holders grip the fruit during and after pitting." Defs.' Brief at

19  18 (citing '949 Patent Abstract, lines 10-12).  Defendants further argue that their construction finds

20  support in the specification, which provides "the separating assembly can include actively driven

21  cam tracks within the knife driving assembly which vary the force with which the holders grip the

22  fruit during and after pitting."  *Id.* (citing '949 Patent 1:15-18).

23       The Court is not persuaded by the Defendants' arguments.  The Defendants' construction

24  merely repeats language that is already in the claim and would render language in the claims

25  superfluous.   Accordingly, the Court finds that the term "vary the gripping force" should be

26  construed to mean  "changing the pressure exerted upon an object."

27  //

28  //

//

36

**United States District Court**
For the Northern District of California

## VI.   CONCLUSION

For the reasons stated above, the Court adopts the following claim constructions:

| Claim Term | Court's Construction |
|---|---|
| 1.      "Fruit" | Requires no further construction |
| 2.      "Pitting" and "Pitting Operation" | "Pitting" is construed as: Removing a pit from a fruit<br><br>"Pitting Operation" is construed as: The process of removing a pit from a fruit and which continues until the pit is outside of the fruit. |
| 3.      "During the Pitting Operation" and "After the Pitting Operation" | "During the pitting operation" is construed as: During the time when the pit is being removed from the fruit.<br><br>"After the pitting operation" is construed as: After the pit is outside of the fruit. |
| 4.      "Active Assembly" | Construed under 112, ¶ 6 as:<br><br><u>Structure:</u>  An assembly containing pneumatically – or solenoid-driven actuators, or mechanical linear actuators, connected to a pair of cam tracks, where the actuators move the cam tracks in response to control signals generated by a timing system operating in synchronism with both the cyclical motion of the holder conveyor and the cyclical motion of the pitting knife assembly.<br><br><u>Function:</u> to engage the holders as the holders pass the pitting knife assembly, and, either (claim 5) to cause the pockets of the holders to be closed during the pitting operation and to move to the open configuration after the pitting operation, or, (claim 12) move relative to the holders so as to vary the gripping force exerted by the pockets on the fruit at appropriate times during and after the pitting operation. |
| 5.      "Holders" | Structure wherein fruit may be placed for transport through a pitting apparatus. |
| 6.      "Pockets" | Individual compartments of a holder, each of which may hold a single piece of fruit. |

| 7. | "Open Configuration" | "the state of the pockets that allows fruit to enter into and out of the pockets." |
|---|---|---|
| 8. | "Vary the Gripping Force" | changing the pressure exerted upon an object. |

IT IS SO ORDERED.

Dated: April 27, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California